**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **THOMPSON SAFETY, LLC** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **C.A. NO. 4:24-CV-2483** |
| | § | |
| **JACE JONES and** | § | |
| **JUSTIN JACKSON** | § | |
| | § | |
| **Defendants.** | § | |

## RESPONSE TO APPLICATION FOR PRELIMINARY INJUNCTION

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE GEORGE HANKS:**

Defendants Jace Jones ("Jones") and Justin Jackson ("Jackson") file this Response to Plaintiff's Application for Preliminary Injunction, and would respectfully show the Court as follows:

### I. INTRODUCTION

The Federal Trade Commission ("FTC") estimates that roughly 20 percent of all employees in the United States are bound by noncompete agreements and similar restrictive covenants. To justify these restraints on trade, employers generally, and Plaintiff specifically, argue that they provide the employees with sensitive information that, without such protection, would either lead to an employer training its future competition or incentivize the employer to not provide any access to information and training, adversely affecting their business and the economy as a whole.

This theory is overprotective and harmful to employees. By way of example, law firms in Texas are prohibited from restricting competition from employees. Despite this

blanket prohibition, law firms routinely spend money training lawyers, provide access to client information, billing rates and their methodology on addressing various legal issues. While any attorney could leave a firm and "hang their shingle," there is no guarantee that clients would follow them or that the new venture will be successful because there is far more to the relationship, and practice, than that information. Law firms are thus forced to reward value through compensation and a more attractive work environment, rather than prohibitions against working in the profession within a given geographic region.

Here, Plaintiff seeks to prevent Defendants, two "Fire Technicians" that perform state-mandated fire extinguisher inspections, from engaging in any work in the industry within *two-hundred miles* of "Houston and surrounding areas." Plaintiff's justification for such a broad is that Defendants were provided information about Thompson's pricing and knows the identity of some of Thompson's customers. Thompson seeks to enjoin Jones and Jackson from participating in the industry not to protect any secrets, but to reduce competition. For the reasons stated herein, Plaintiff is not entitled to injunctive relief.

## II. ARGUMENT & AUTHORITIES

### A. PRELIMINARY INJUNCTION STANDARD.

To establish entitlement to a preliminary injunction, Plaintiff must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in their favor; and (4) that the issuance of the preliminary injunction will not disserve the public interest. *Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). As movant, the party

seeking relief bears the burden of proving all four elements of the preliminary injunction. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).

As an extraordinary remedy, an injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff[ ]." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 756, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (cleaned up). Thus, an injunction must "redress the plaintiff's particular injury," and no more. *Gill v. Whitford*, 585 U.S. 48, 73 (2018) (citation omitted).

## B. PLAINTIFF CANNOT ENFORCE OVERBROAD RESTRICTIONS; REFORMATION NOT PERMITTED FOR TEMPORARY INJUNCTION.

Because the injunctive relief sought involves the enforcement of restraints on trade, Defendants begin by analyzing the reasonableness, and thus enforceability of, those provisions. In Texas, an "agreement not to compete is in restraint of trade and therefore unenforceable on grounds of public policy unless it is reasonable." *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 681 (Tex. 1990); see also TEX. BUS. & COM. CODE § 15.05(a). A court will enforce a restrictive covenant when it conforms to section 15.50(a) of the Texas Business and Commerce Code, which provides:

> [A] covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

TEX. BUS. & COM. CODE § 15.50(a). The Court must determine whether the restrictions are reasonable under Texas law, which is a matter of law for the Court to decide. *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 386 (Tex. 1991). In the case of a contract for

personal services, the promisee – Thompson – bears "the burden of establishing that the covenant meets the" requirements of time, geography, and scope in section 15.50. TEX. BUS. & COM. CODE § 15.51(b).

In a unique situation, Plaintiff seeks to enforce not one, but two separate agreements against these fire technicians. On May 21, 2020, Jones entered into an agreement with Sterling regarding his employment at that company. [ECM 5-6]. Jackson signed a similar agreement at an unknown date (collectively the "Sterling Agreements"). [ECM 5-7]. On September 6, 2023, and September 15, 2023, Jones and Jackson, respectively, signed employment agreements with Thompson (the "Thompson Agreements"). [ECM 5-4; 5-5].

The restrictive covenants of each will be addressed in turn.

### 1.    *The Sterling Noncompete Restraints Are Fatally Overbroad.*

The provision of the Sterling Agreements that Plaintiff relies upon to justify enjoining their participation in the labor market relief provides:

> **Section 10.   Not to Compete.** The Employee agrees that on termination of employment either voluntarily or involuntarily by the Employer or Employee, the Employee will not directly or indirectly solicit the Employer's customers or accounts or engage in Employer's business or in any competitive business within a two hundred (200) mile radius of any person, firm company, or corporation engaged in the business of placing first aid and safety supply or fire extinguishers for a two (2) year period from the date when employment under the Agreement ceases.

[ECM 1-5 p. 3]; [ECM 1-6 p. 3]. As provided, Jones and Jackson are prohibited from working "within a two hundred (200) mile radius of *any person, firm company*, or corporation engaged in the business of placing … fire extinguishers." *Id.* (emphasis added). Read precisely, as one must, this provision prevents Defendants from working in the fire

extinguisher inspection industry within 200 miles of *any* entity engaged in this business.[1]

The business entails certifying proper fire suppression systems in commercial buildings, something that is required *by law* everywhere in the United States. Thus, anywhere that there are commercial buildings, there will be some company engaged in the business of compliance with the ordinances requiring particular fire suppression systems. The Sterling Agreements prevent Defendants from working within 200 miles of *any* such company. This type of industry-wide exclusion is not permitted under Texas law. *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 386-88 (Tex. 1991).

Perhaps recognizing the overly broad nature of the Sterling Agreement noncompete, Plaintiff instead seeks an injunction preventing any work in the industry in a vaguely described territory covering a significant portion of Texas:

> 3.      Defendants are enjoined from carrying on or engaging directly or indirectly in the business of placing first aid and safety supplies or fire extinguishers within a two hundred (200) mile radius of where Thompson operates in the Houston and surrounding areas. For clarity, this injunction includes but is not limited to directly or indirectly, (A) owning, managing, operating, joining, becoming an employee of, controlling or participating in any business or person which engages in the business of placing first aid and safety supplies or fire extinguishers or (B) loaning money to or sell or leasing equipment to any business or person which engages in the business of placing first aid and safety supplies or fire extinguishers.

[ECM 5-12]. Thus, Plaintiff seeks to prevent Defendants, who physically inspect fire

---

[1] Courts will "not remake their contract by reading additional provisions into it." *Sojitz Energy Venture, Inc. v. Union Oil Co. of California*, 394 F. Supp. 3d 687, 701 (S.D. Tex. 2019) (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). "The parties' intent is governed by what is written in the contract, not by what one side contends they intended but failed to say." *Id.*

extinguishers in commercial buildings, from doing so anywhere in the following area[2]:



Most would consider areas like Katy or The Woodlands to be "surrounding areas" of Houston which would greatly expand the exclusion. Even under this smaller area, should Defendants move their families to Austin, Texas or Lafayette, Louisiana, the injunction would still prevent them from any participation in a fire service company. This is significantly more area than courts have enforced in the context of business sales and franchise agreements, much less a noncompete agreement enforced against a rank-and-file employee. Cf. *Meineke Disc. Muffler v. Jaynes*, 999 F.2d 120, 123-24 (5th Cir. 1993) (enforcing 25-mile exclusion on a franchise agreement); *Amerispec, Inc. v. Metro Inspection Servs., Inc.*, No. 3:01-CV-0946-D, 2001 WL 770999 (N.D. Tex. July 3, 2001) (enforcing a franchise agreement's ten-mile non-competition covenant).

    While Texas law permits this Court to reform the restrictions of a noncompete

---

[2] It is worth noting that this area is significantly smaller than that described in the proposed injunction, as this is merely a 200-mile radius from a single point in downtown Houston, not 200 miles from various points comprising the undefined "surrounding areas" of Houston.

provision it finds to lack reasonable limitations as to time, geographic area or scope, such determination is not appropriate at a preliminary injunction. See *Gray Wireline Serv., Inc. v. Cavanna*, 374 S.W .3d 464, 470 (Tex. App. – Waco 2011, no pet.) ("[W]e agree that reformation pursuant to section 15.51(c) of the Business and Commerce Code is a remedy to be granted at a final hearing, whether on the merits or by summary judgment, not as interim relief."); *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 238–39 (Tex. App. – Houston [1st Dist.] 2003, no pet.) (en banc) ("Reformation is generally a final remedy."). Thus, because the Sterling Agreements' restriction is overly broad and constitutes an industry-wide exclusion, the only way to enforce the Sterling Agreements would be through a reformation after a final hearing.

Finally, it is worth noting that Plaintiff *knows* this geographical restriction is excessive, yet still seeks to enforce it. "A covenant not to compete with a broad geographical scope is unenforceable, <u>particularly when no evidence establishes the employees actually worked in all areas covered by the covenant</u>." *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793-94 (Tex. App. – Houston [1st Dist.] 2001, no pet.) (emphasis added). In his declaration in support of the Application, Plaintiff's representative states "Jones and Jackson primarily serviced north Houston, including Conroe and surrounding areas." Roesler Declaration p. 4 [ECM 5-1]. Despite acknowledging in sworn testimony that Jones and Jackson's services were confined to "north Houston, including Conroe and surrounding areas"[3], Plaintiff seeks to prevent them from working in the

---

[3] It seems safe to assume from this statement Thompson would include Conroe as a "surrounding area" of Houston, starting the 200-mile radius from Conroe, at the very least, in their interpretation of the geographic limits, pushing the

industry in an area spanning hundreds of miles demonstrating its goal to restrict competition, not protect a legitimate business purpose.[4]

> ### 2. *Thompson's Employee Non-Solicitation Restriction is Overly Broad.*

Under the Thompson Agreements, Thompson seeks to restrict Jones and Jackson from being able to solicit Thompson employees:



> b. *Restriction on Interfering with Employee Relationships.* Employee agrees that during employment with Company, and for a period of seven hundred and thirty (730) days following the termination of Employee's employment with the Company, Employee will not, either directly or indirectly, hire, call on, solicit, or take away, or attempt to call on, solicit or take away any of the employees or officers of the Company or encourage any employees or officers of the Company to terminate their relationship with the Company.

 [ECM 5-4, p. 2]; [ECM 5-4, p. 2]. As with the Sterling Agreements, this is overly broad and unenforceable as drafted. Here, Jones and Jackson cannot hire "any of the employees or officers of the Company" regardless of whether Defendants had any contact with a particular employee. Thompson is a large company, stating under oath in support of the Application that it is:

> a full-service fire and safety company that serves customers in multiple states, including Arizona, Colorado, Kansas, Massachusetts, Missouri, Michigan, Georgia, Florida, North Carolina, Pennsylvania, and Texas.

[ECM 5-1, ¶5].[5] Under the restrictive covenant, Defendants cannot hire employees from

---

excluded area past Dallas.

[4] By knowingly seeking enforcement of a restraint that is broader than necessary, Thompson can be liable to Jones and Jackson for their reasonable and necessary attorneys' fees and costs. See *Franlink, Inc. v. GJMS Unlimited, Inc.*, 401 S.W.3d 705, 711-12 (Tex. App. – Houston [14th Dist.] 2013, pet. denied) (noting "subsection (c) provides for an award of attorney's fees in a single circumstance: In the context of a personal services agreement, attorney's fees may be awarded to a promisor who satisfies certain evidentiary requirements in defending against enforcement of an unreasonable covenant.").

[5] It's worth noting that Thompson does not claim to operate in Louisiana, yet the 200-mile exclusion they seek to enforce would cover roughly a third of the state.

any state if they worked for Thompson.

This restriction is overly broad. The Northern District of Texas, applying Texas law, ruled a similar employee nonsolicitation provision unenforceable. The Court noted:

> [t]he provision covers 'any employee' … [t]he Agreement would prevent [employee] from soliciting hundreds of [his former employer's] employees with whom he had no contact during his period of employment and goes beyond what was necessary to protect [the employer's] business interests. [The employer] could have protected its legitimate business interests by prohibiting solicitation of a limited subset of employees with who [the employee] had worked.

*U.S. Risk, LLC v. Hagger*, 650 F. Supp. 3d 520, 528-29 (N.D. Tex. 2023) (emphasis added) citing *Ally Fin., Inc. v. Gutierrez*, 2014 WL 261038, at *8 (Tex. App. — Fort Worth 2014, no pet.). The Court ruled that "[a]ccordingly, the employee nonsolicitation provision is overbroad and unenforceable. *Id.* at 529. Thompson's employee nonsolicitation provision is similarly overbroad and unenforceable.

### 3.    *Thompson's Customer Non-Solicitation Restriction.*

To the extent that the Thompson nonsolicitation provision prevents Defendants from doing business at all with covered customers—without regard to whether Defendants solicited the business or as to the business that is being done—it is overly broad. If a customer has determined to leave Thompson and contacts Defendants for services, there is no longer any customer goodwill to protect. Thompson has already lost the customer for reasons unrelated to Defendants. Moreover, the provision prevents Defendants from doing any work at all—whether it is related to work Defendants did for Plaintiff or not—and Plaintiff has no interest in preventing that work. Finally, the provision fails as a whole because there is no legitimate business interest to protect.

## C.  PLAINTIFF CANNOT ENFORCE STERLING AGREEMENTS.

In addition to seeking to enforce the Thompson Agreements, Thompson seeks to enforce the Sterling Agreements. An executory contract for personal services cannot be assigned by the employer without the employee's consent, as everyone has the right to determine with whom he will contract. *Am. Biomedical Corp. v. Anderson*, 546 S.W.2d 112, 116 (Tex. Civ. App.—Amarillo 1977, no writ). When the employee makes a contract restricting his right to compete, and provides that the contract is assignable, an employer may assign the contract. *Tex. Shop Towel v. Haire*, 246 S.W.2d 482, 484 (Tex. Civ. App.—San Antonio 1952, no writ). But, because a business owner may require from his employee a covenant not to compete; it does not follow that he can transfer the covenant to a buyer without the employee's consent. *Id*.

The personal services exception applies when a contract relies on the parties' personal trust, confidence, *skill*, character, or credit. *In re FH Partners, L.L.C.*, 335 S.W.3d 752, 762 (Tex. App. – Austin 2011, orig. proceeding). Here, the Sterling Agreements provide:

> WHEREAS, the Employee has experience and expertise in the business of selling first aid and safety supplies and fire extinguishers which the Employer recognizes will be beneficial to its business operations; and

[ECM 5-6, p. 1; 5-7, p. 1]. The plain language of the Sterling Agreements reflects reliance on Defendants' experience and not just skill, but "expertise" in the business; thus, the Sterling Agreements qualify as a personal services contract. See *Alattar v. Kay Holdings, Inc.*, 485 S.W.3d 113, 119 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (courts

construe unambiguous contract language according to its plain language as matter of law).
The Sterling Agreements are not assignable to Thompson without Defendants' consent,
which they did not provide. *Cf.* Thompson Agreements [ECM 5-4 ¶ 4; ECM 5-5 ¶ 4]
(allowing employer assignment).

### D.   PLAINTIFF CANNOT SHOW A PROBABLE RIGHT TO RECOVERY.

Having established that Plaintiff cannot obtain a preliminary injunction on either the
Sterling Agreements or the employee nonsolicitation contained within the Thompson
Agreements because such provisions are overly broad and would require reformation,
Defendants next turn to the injunctive relief sought from the customer nonsolicitation
provision of the Thompson Agreements and through Plaintiff's tort claims.

To obtain a preliminary injunction, the movants must show that they are likely to
succeed on the merits of at least one of their claims. *Daniels Health Servs.*, 710 F.3d at
582. Plaintiff has alleged four causes of action against Defendants: 1) breach of contract,
consisting of allegations of breaching two employment agreements for each Defendant; 2)
misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836;
3) misappropriation of trade secrets under the Texas Uniform Trade Secrets Act, Tex. Civ.
Prac. & Rem. Code §134A; and 4) a violation of the Computer Fraud and Abuse Act, 18
U.S.C. §1030. Defendants will address the merits of Plaintiff's breach of contract claim
and the combined tort claims separately.

### 1.   *The Information at Issue is Not a "Trade Secret" Nor Thompson's Confidential Information.*

Each of Jones and Jackson signed an agreement with Thompson which defines its

confidential information (the "<u>Thompson Confidential Information</u>"):

> 2. **_Confidential Information._** The Company agrees that it will provide Employee with Confidential Information, as defined below that will enable Employee to optimize the performance of Employee's duties to the Company. In exchange, Employee agrees to use such Confidential Information solely for the Company's benefit. The parties agree that, for purposes of this Agreement, "Confidential Information" is information ==acquired by Employee in the course and scope of his or her activities for the Company== that is designated by the Company as "confidential" or that the Company indicates through its policies, procedures, or other instructions should not be disclosed to anyone outside the Company except through controlled means and may include, without limitation, compilations of market information, customer lists, and business plans of the Company. Employee agrees to use such Confidential Information for the exclusive benefit of the Company, and Employee shall not, during employment with the Company or thereafter, directly or indirectly, use the Confidential Information for any other purpose. Some examples of Confidential Information are internal financial statements and analysis, personnel files and evaluations, internal pricing and cost information, customer lists and contacts information, salary and compensation information, and information concerning specific customer needs.

 [ECM 1-3 p. 1]; [ECM 1-4 p. 1]. Applying Thompson's definition, to qualify as Thompson Confidential Information, Jones and Jackson had to acquire the information "<u>in the course and scope of his or her activities for the Company</u>**.**" *Id*. (emphasis added). The "Company" is defined in the Thompson Agreements as "Thompson Safety LLC, a Delaware limited liability company." *Id*. The dictionary defines "acquire" to mean "*to come into* possession, control, or power of disposal." Acquire, WEBSTER'S NEW INT'L DICTIONARY (2002) (emphasis added). Thus, any information or knowledge Jones and Jackson had *prior to* being employed by Thompson in September 2023, cannot be, by definition, Thompson Confidential Information. Furthermore, information and knowledge that Jones and Jackson already possess or previously obtained cannot constitute consideration for their agreement to not compete as it requires nothing from Thompson. See *Trilogy Software, Inc. v. Callidus Software, Inc*., 143 S.W.3d 452, 463 (Tex. App. – Austin 2004) ("past provision of proprietary information and specialized training would be past consideration and therefore not competent consideration for contract formation"); see also Jordan Leibman & Richard Nathan, *The Enforceability of Post-employment Noncompetition Agreements*

*Formed After At–Will Employment Has Commenced: the "Afterthought" Agreement*, 60 S. Cal. L.Rev. 1465, 1528–29 (1987) ("If anything in the classical law of contracts is clear, it is that past consideration is not good consideration. Any exchange has to be contemporaneous by definition, because the promise and the consideration for that promise must serve as reciprocal conventional inducements.").

Under the Thompson Agreements, not all information the company produces or possesses rises to the level of Thompson Confidential Information[6]. To be Thompson Confidential Information, the Thompson Agreements require that it be "*designated* by the Company as 'confidential' or that the Company indicates through its policies, procedures, or other instructions should not be disclosed to anyone outside the Company *except through controlled means*." *Id*. (emphasis added). Thus, Plaintiff had an affirmative duty to notify Defendants that it considered any piece or class of information confidential. The heart of Plaintiff's complaint is that Jones emailed the Thompson price list to himself, and that such information is a trade secret or otherwise confidential. This is nonsense. Not only did Thompson not "designate" the price information as "confidential" [ECM 5-3], but the entire purpose of providing a price list to an employee is to enable the employee to accurately convey that information to customers and prospective customers. It was never designated "confidential" because it was never intended to remain so.

---

[6] Further, Thompson's overly broad definition of "Confidential Information" does not convert public information into confidential information. See *Shoreline Gas, Inc. v. McGaughey*, 2008 WL 1747624 fn. 3, 7 (Tex. App. – Corpus Christi – Edinburg April 17, 2008) (noting that "although this information … was considered 'confidential information' and 'trade secrets' under the definitions provided in the Agreement, this does not mean that they were in fact confidential or trade secrets. In actuality, the definitions provided in the Agreement were overly broad and included pieces of information that are publicly available.") (emphasis added).

The pricing information is available not only to every Thompson employee that interacted with customers, but also to customers and potential customers. If one wants to know Thompson's prices for a particular service, one need only ask:



See Thompson Website.[7] Defendants are unaware of any company promoting access to their alleged trade secrets through the click of a button on a website. Such information is not secret and cannot support the enforceability of a noncompete. See *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 684 (Tex. 1990) (holding noncompete unenforceable when plaintiff "failed to show that its pricing policies and bidding strategies were uniquely developed, or that information about its prices and bids could not, again, be obtained from the customers themselves.") (emphasis added).

The customer identities themselves also cannot be a trade secret or Thompson Confidential Information. Thompson itself invites its customers to self-disclose, making clear that it does not want to keep the relationship "confidential" or "secret":



---

[7] https://thompson-safety.com/ visited July 31, 2024.

Thompson Website.[8] Rather than designating such information confidential, Plaintiff invites its customers to identify themselves and write a review about their services.

Nor are the "specific customer needs" a trade secret or Thompson Confidential Information. In the Application, Plaintiff provides photographs of Jones Fire labels on extinguishers in certain commercial buildings:



[ECM 5 p. 11; 5-2]. In it, one can identify the name, address and phone number of the company providing the verification, as well as the technician and the date of service – March 2024. All fire extinguishers in commercial businesses are required to be similarly tagged, and they are required to be verified at least annually.[9] One doesn't have to peruse the Texas Administrative Code to learn this – Thompson advertises this on its website:

---

[8] https://thompson-safety.com/company/testimonials visited August 5, 2024.

[9] See TEX. ADMIN. CODE §748.3117 (requiring a licensed inspection "at least annually" and that the "documentation must indicate the date of the inspection and the inspector's name and telephone number.").

> **What is NFPA 10?**
>
> National Fire Protection Association (NFPA) is the regulatory body that governs fire protection. NFPA 10 is the regulation specifically for fire extinguishers. In the United States, most extinguishers require monthly checks as well as annual inspections (at a minimum) however, it is important to consult with the local AHJ to determine the requirements for your businesses extinguishers.

Thompson Website.[10] The inspections are required because, in an emergency, one needs to be confident that the extinguisher will dispense the fire suppressant. For the same reason, fire extinguishers are required to be placed in a conspicuous location, enabling any individual in a commercial building to easily locate a tag such as the ones attached.

Thompson does not enjoy a competitive advantage for possessing this information because it is common knowledge in the industry. This cannot support Plaintiff's claims for misappropriation or be the basis of a noncompete. See *DeSantis*, 793 S.W.2d at 684 (holding noncompete unenforceable when plaintiff "failed to show that its customers could not readily be identified by someone outside its employ, that such knowledge carried some competitive advantage, or that its customers' needs could not be ascertained simply by inquiry addressed to those customers themselves.") (emphasis added).

Even if Thompson can establish that any of the above information was a trade secret, Texas law instructs that the trade secret owner "will lose his secret by its disclosure unless it is done in some manner by which he creates a duty and places it on the other party not to further disclose or use it in violation of that duty." *Taco Cabana Int'l v. Two Pesos, Inc.*, 932 F.2d 1113, 1123–24 (5th Cir.1991) (emphasis added) (citing *Furr's, Inc. v. United*

---

[10] https://thompson-safety.com/fire/extinguisher visited July 31, 2024.

*Specialty Advertising Co*., 385 S.W.2d 456, 459 (Tex. Civ. App. – El Paso 1964, writ ref'd n.r.e.), cert. denied 382 U.S. 824, 86 S.Ct. 59, 15 L.Ed.2d 71 (1965)); see also *Carson Products Co. v. Califano*, 594 F.2d 453, 461 (5th Cir.1979) (however strong other indicia of trade secret status may be, subject matter must be secret, such that acquiring information would be difficult except by improper means). Plaintiff cannot establish any duty owed by any recipient of the information which would prevent one from determining pricing, who particular clients are, or when serviced.

Without satisfying the requirements of a trade secret or Thompson Confidential Information, Plaintiff cannot establish an "interest worthy of protection" as required by Texas law. *Alex Sheshunoff Management Services, L.P. v. Johnson*, 209 S.W.3d 644, 648-49 (Tex. 2006). Plaintiff cannot show a likelihood of success on the merits.

### 2.    *Plaintiff Cannot Show Breach of an Enforceable Contract.*

Covenants that place limits on former employees' professional mobility or restrict their solicitation of the former employers' customers and employees are restraints on trade and governed by the Act." *Marsh USA v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011). However, the objective of a non-compete should not be to "restrain competition," which "is the basis for the requirement that the covenant be ancillary to a valid contract or transaction having a primary purpose that is unrelated to restraining competition between parties." *Id*. at 771.

Further, Plaintiff cannot show that Defendants breached the Thompson Agreements. The Thompson Agreements provide:

> c. *Restriction on Interfering with Customer Relationships.* Employee agrees that during employment with the Company, and for a period of seven hundred and thirty (730) days following the termination of Employee's employment with the Company, Employee will not, directly or indirectly, except in connection with Employee's employment with the Company, service, call on, solicit, or take away, or attempt to call on, solicit, or take away any of those customer entities and/or persons who did business with the Company and that Employee either (i) received Confidential Information about, or (ii) had contact with within the last twenty-four (24) month period that Employee was employed with Company.

[ECM 5-4, p. 2]; [ECM 5-5, p. 2]. For any relationship between Defendants and a third-party Thompson alleges violates this provision, Thompson must show that third-party "did business with the Company" – Thompson – <u>and</u> Plaintiff either i) provided Thompson Confidential Information about that third-party to Defendants, or ii) the third-party had contact with Defendants during the six months they were employed by Thompson.

In its common understanding, whether a third-party "did business with" Thompson would require a showing of economic activity between Thompson – not Sterling – and that party. If Thompson establishes that Defendants engaged in a business relationship with one of Thompson's customers, Thompson must then show that Thompson provided Thompson Confidential Information to Defendants or that Defendants had contact with that party during their brief employment with Thompson. After Thompson acquired certain assets from Sterling, a number of Sterling customers opted not to engage in business with Thompson. Plaintiffs seek to enjoin Defendants from providing services for third parties that had a business relationship with *Sterling*, which is not prohibited under the Thompson Agreements.

Even upon a showing of a business relationship with a party, Thompson must show that it either provided Thompson Confidential Information – which, as discussed above, can only include information Defendants "acquired" from Thompson itself – or that

Defendants had contact with during their employment with Thompson. This requires a party-by-party review, and not the generalities that Plaintiff has provided.

### 3. Plaintiff Cannot Show Misappropriation of a Trade Secret or Any Misuse of Confidential Information.

Under both the Defend Trade Secrets Act ("DTSA") and the Texas Uniform Trade Secrets Act ("TUTSA") a party must show the existence of a trade secret. 18 U.S.C. § 1836(b)(1); TEX. CIV. PRAC. & REM. CODE Ch. 134A. A trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996)). Key to the definition of a trade secret is the element of secrecy, implying that the information "is not generally known or readily ascertainable by independent investigation." *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 552 (Tex. App. – Dallas 1993, no writ). Information generally known and readily available is not protectable, and no trade secret protection is available when the material or procedure at issue has been publicly disclosed. *Gonzales v. Zamora*, 791 S.W.2d 258, 268 (Tex. App. – Corpus Christi 1990, no writ).

Plaintiff lists the alleged violations as "improperly sending Thompson's pricing list to his personal email account", "improperly using Thompson's pricing list", and "knowledge of Thompson's customer list and inspection schedule" to "usurp Thompson's customers and customer relationships." Application [ECM 5 p. 6]. To determine whether a trade secret exists, Texas courts apply the Restatement of Torts' six-factor test:

(1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of the measures taken by [the company] to guard the secrecy of the information; (4) the value of the information to [the company] and to [the company's] competitors; (5) the amount of effort or money expended by [the company] in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Bass*, 113 S.W.3d at 739 (quoting RESTATEMENT OF TORTS § 757 cmt. b. (1939)).

Because four of the six factors relate to the secrecy of the information, there must be a substantial amount of attendant secrecy for information to be a trade secret. See *Rugen* 864 S.W.2d at 552. Where the information is "so common, well known or readily ascertainable that it lacks all novelty, uniqueness and originality, it necessarily lacks the element of privacy necessary to make it legally cognizable as a trade secret." *Cockerham v. Kerr–McGee Chem. Corp.*, 23 F.3d 101, 105 (5th Cir.1994) (quoting *Cataphote Corp. v. Hudson*, 444 F.2d 1313, 1315–16 (5th Cir. 1971)). Applying these factors to the alleged conduct demonstrates that Thompson is not protecting any trade secrets.

a) <u>Thompson Price List is Not a Trade Secret and Not Used By Defendants.</u>

As discussed above in detail, the price list is not a trade secret. Regarding the first factor, we know that *every* customer of Thompson, and likely almost all prospective customers, have knowledge of the prices Thompson charges for the services the customer receives. "The law will imply as part of the employment contract an agreement not to disclose information which the employee receives as an incident of his employment '<u>if the employee knows that his employer desires such information be kept secret</u>, or if, under the circumstances, he should have realized that secrecy was desired.'" *Mercer v. C. A. Roberts*

*Co.*, 570 F.2d 1232, 1238 (5th Cir. 1978) quoting *Lamons Metal Gasket Co. v. Traylor*, 361 S.W.2d 211, 213 (Tex. Civ. App. – Houston 1961, writ ref. n. r. e.). Here, Thompson explicitly informed Defendants that it would designate or otherwise inform Defendants of information it deemed confidential, and the price list contains no such label. [ECM 5-3].

There is no reason for Thompson to have provided Jones the pricing information if it did not *intend* for him to share that information with customers and prospective customers. While Thompson reasonably would not expect Jones to share that information with competitors – which he did not – Thompson cannot expect that information about its pricing would remain secret, especially since it did not require secrecy of that information from its customers and potential customers. See *DeSantis*, 793 S.W.2d at 684.

Plaintiff places a lot of emphasis on Jones emailing the pricing list to his personal email in January 2023 but makes no connection regarding how that is wrongful. Again, there was no indication on the price list that he should not do that, and Plaintiff makes no allegation of its misuse other than to speculate that he saved it for use months later in March 2023. Plaintiff provides no evidence of the information's misappropriation; this does not support injunctive relief.

### b) Customer List and Inspection Schedule are Not Trade Secrets.

The Fifth Circuit has recognized that under Texas law, "it has been held that a mere list of customers does not constitute a trade secret." *Mercer*, 570 F.2d at 1238 (5th Cir. 1978). Further, while "[t]here is no doubt" that "the specific needs and buying habits of various customers … would greatly aid a would-be competitor", the Fifth Circuit "cannot

say it rises to the level of a trade secret." *Id.* at 1238-39; *see also Brooks v. American Biomedical Corp.*, 503 S.W.2d 683 (Tex. Civ. App. Eastland 1973, writ ref. n. r. e.) (holding that credit information regarding prices, courier routes, and customers of a business, as well as the employees of those customers, did not constitute a trade secret and that these matters "are generally known to any person engaged in this business or can be ascertained by an independent investigation.").

First, Thompson is trying to count as *its* "customer list" parties it never performed services for, and which had relationships with Defendants *prior* to their brief employment with Thompson. Further, Thompson ignores that, just as it was able to determine some of Jones Fire's customers by simple investigation, its customers are similarly identifiable. Finally, Thompson itself publishes on its website a timetable for inspections, which is known to everyone in the industry:

| Monthly visual inspections | Annual functional inspections |
|---|---|

Thompson Website.[11] Thompson also has not, and cannot, provide any evidence that any specific customer needs could not be learned simply be asking them.

###    E.    THOMPSON CANNOT SHOW IRREPARABLE HARM.

"The extraordinary equitable remedy of an injunction requires that the [movant] demonstrate that, without injunctive relief, he will suffer an irreparable injury for which damages are an inadequate remedy." *Jones v. American Council on Exercise*, 245 F. Supp.

---

[11] https://thompson-safety.com/fire/extinguisher; last visited August 1, 2024.

3d 853, 867 (S.D. Tex. 2017) (quotation marks omitted) (J. Miller). "[T]he injury at issue must be actual and imminent, not speculative or remote." *Allied Home Mortgage Corp. v. Donovan*, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011) (J. Harmon). A showing of economic loss is usually insufficient to establish irreparable harm because damages may be recoverable at the conclusion of litigation. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). However, "an exception exists where the potential economic loss is <u>so great as to threaten the existence of the movant's business</u>." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989) (emphasis added); see also *Allied Home* at 228 ("Irreparable injury may be shown where a business 'would suffer a substantial loss of business and perhaps even bankruptcy' absent injunctive relief.") (quoting *Doran v. Salem Inn, Inc*., 422 U.S. 922, 932 (1975)).

Thompson describes its business in a sworn declaration as a strong business operating in at least twelve states and providing "customers with first aid, safety supplies and personal protective equipment, automated defibrillators, eyewash, fire extinguishers and other fire protection services, training services and overall management of their safety programs." Relevant fire extinguishers, Thompson provides "monthly visual inspections and annual functional inspections, maintenance and testing." [ECM 5-1 ¶¶ 5-6]. The Thompson Website paints an equally strong image of the company's health as the "fastest growing" business in its industry:

> We are the fastest growing safety services company in North America. Our customer-centric service, innovative technologies, and tenacious culture helps you improve what matters most — your employee's safety.

Thompson Website.[12]

In contrast, Thompson notes that Jones and Jackson were "Fire Technicians" for Sterling, and then Thompson. [ECM 5-1 ¶¶ 10, 13]. Their employment with "the fastest growing safety services company in North America" lasted from September 2023 until March 2024. Neither Jones nor Jackson appears on the "Leadership Team" webpage on Thompson's website, and neither benefited financially in the sale of Sterling's assets to Thompson. Each Defendant travels on a regular basis to commercial buildings and physically inspects fire extinguishers and similar devices. Plaintiff provides no evidence that Defendants alleged conduct presents "irreparable harm" of a "potential economic loss is so great as to threaten the existence of the movant's business" because it cannot.

Plaintiff claims that it has "lost twenty (20) customers and will likely lose more." [ECM 5, p. 13]. Assuming, without conceding, that Plaintiff can establish its claims for injury, economic damage could compensate Plaintiff for the alleged loss, and injunctive relief is not warranted.[13] Plaintiff cannot establish irreparable harm, and thus is not entitled

---

[12] https://thompson-safety.com/company/locations; visited August 1, 2024.

[13] See *Altana Pharma AG v. Teva Pharmaceuticals USA, Inc.*, 532 F.Supp.2d 666, 682 (D.N.J.2007) (finding movants did not establish irreparable harm despite contending "loss of revenue, price erosion, decrease in market share, loss of research opportunities, [and] reduction in workforce"); see also *Mike's Train House, Inc. v. Broadway Ltd. Imports, LLC*, 708 F.Supp.2d 527, 532 (D.Md.2010) ("Because potential lost sales revenue is compensable through damages, evidence of such losses is insufficient by itself to support a finding of irreparable harm.").

to a preliminary injunction.

**F.     RELATIVE WEIGHT OF HARM SUPPORTS DENIAL OF INJUNCTION.**

As discussed above, Plaintiff has not and cannot show that Defendants participation in the fire inspection marketplace threatens its existence. On the other hand, Plaintiff seeks an injunction that would preclude Defendants from working within an area with a radius in excess of 200 miles. [ECM 5-12 ¶3]. This area, as discussed above, extends into many areas Defendants never worked, and even into a state – Louisiana – in which *Plaintiff* doesn't claim to have a presence. This injunction is not intended to protect any legitimate business interest, but to remove Defendants from the industry.

**G.     PLAINTIFF CANNOT SHOW THE INJUNCTION WILL NOT DISSERVE THE PUBLIC INTEREST.**

As discussed above, Plaintiff seeks a preliminary injunction which would clearly harm Defendants – seeking to exclude them from their profession within the better part of eastern Texas. In addition, Plaintiff identifies 20 customers of Jones Fire that would lose its service provider of choice. Because the injunction sought is overbroad and unreasonable, Plaintiff cannot meet its burden of persuasion on this factor.

## III.     PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants Jace Jones and Justin Jackson respectfully request this Court deny Plaintiff's Application for Preliminary Injunction and grant any other relief as the Court deems just and equitable.

Respectfully submitted,

**HOPKINS | CENTRICH, PLLC**

By: /s/ *Joseph F. Centrich*
   Joseph F. Centrich
   State Bar No. 24055283
   jcentrich@hopkinscentrich.com
   Joseph P. Crescenzo III
   State Bar No.: 24072052
   jcrescenzo@hopkinscentrich.com
   8701 New Trails, Suite 200
   The Woodlands, Texas 77381
   Tel: (281) 210-0140
   Fax: (832) 202-0399

   **ATTORNEYS FOR DEFENDANT,
   JACE JONES**

   **-AND-**

**WINKELMAN PLLC**

By: /s/ *C. Lee Winkelman*
   State Bar No. 24042176
   lee@winkesq.com
   15802 Jersey Drive
   Jersey Village, Texas 77040
   Tel: (281) 786-7196
   Fax: (832) 202-0399

   **ATTORNEYS FOR DEFENDANT,
   JUSTIN JACKSON**

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed this document on August 7, 2024, and that a true and correct copy of the foregoing was served on all counsel of record via CM/ECF/facsimile transmission as follows:

**Haynes Boone LLP**
Michael Lombardino
Michael.Lombardino@haynesboone.com
Christina Gad
Christina.Gad@haynesboone.com
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Telephone: 713.547.2301
Facsimile: 713.547.2600

*Attorneys for Plaintiff*

/s/ *Joseph F. Centrich*
Joseph F. Centrich