IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| THOMPSON SAFETY, LLC | § | CASE NO. 4:24-CV-02483 |
| | § | HOUSTON, TEXAS |
| v | § | THURSDAY, |
| | § | AUGUST 8, 2024 |
| JACE JONES, ET AL | § | 4:03 P.M. TO 6:14 P.M. |

**<u>INJUNCTION HEARING (VIA ZOOM)</u>**

BEFORE THE HONORABLE GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:                    SEE NEXT PAGE

CASE MANAGER:                   KIMBERLY PICOTA

COURTROOM ERO:                  AARON JACKSON

<u>TRANSCRIPTION SERVICE BY:</u>

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**<u>APPEARANCES</u>:**


FOR THE PLAINTIFF:            HAYNES & BOONE, LLP
                             Michael J. Lombardino, Esq.
                             Christina Gad, Esq.
                             1221 McKinney Street
                             Suite 4000
                             Houston, TX 77010
                             713-457-2301


FOR THE DEFENDANTS:           HOPKINS CENTRICH, PLLC
                             Joseph P. Crescenzo, III, Esq.
                             8701 New Trails Drive
                             Suite 200
                             The Woodlands, TX 77381
                             281-210-0140


ALSO PRESENT:                 David Roesler
                             Lee Winkelman
                             Jace Jones
                             Justin Jackson

**INDEX**

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| DAVID ROESLER | | | | |
| By Ms. Gad | 6 | . | 49 | . |
| By Mr. Crescenzo | . | 32 | . | . |
| By Mr. Winkelman | . | 45 | . | . |
| | | | | |
| JACE JONES | | | | |
| By Mr. Lombardino | 52 | . | 64 | . |
| By Mr. Crescenzo | . | 61 | . | . |
| | | | | |
| JUSTIN JONES | | | | |
| By Mr. Winkelman | 68 | . | . | . |
| By Mr. Lombardino | . | 80 | . | . |

| EXHIBITS: | Admitted |
|---|---|
| Exhibit 1 | 11 |
| Exhibits 3 and 4 | 16 |
| Exhibits 5 and 6 | 16 |
| Exhibit 7 | 25 |
| Exhibit 8 | 22 |
| Exhibit 9 | 29 |

\*\*\*

1          **HOUSTON, TEXAS; THURSDAY, AUGUST 8, 2024; 4:03 P.M.**

2               THE COURT:  The next case on the Court's docket is

3          Cause Number 4:24-CV-2483, Thompson Safety, LLC versus Jones,

4          et al.  Can counsel on the line or any of the parties that are

5          going to be representing themselves or speaking on the line,

6          if you could just introduce yourselves to the Court and state

7          who you represent or who you are, starting with the

8          Plaintiff's counsel.

9               MR. LOMBARDINO:  Sure.  Michael Lombardino on behalf

10         of Thompson Safety, the Plaintiff.  And I also have with me in

11         my office is Christina Gad and Harry Phillips, and then David

12         Roesler is a fact witness who's prepared to --

13              (Glitch in the audio from 4:03:39 to 4:04:32)

14              THE COURT:   -- agreements that I know about?

15              MR. LOMBARDINO:  Well, the parties did submit an

16         agreed protective order and it tracks exactly your form order

17         which is made available, I'm not sure.  But so we would

18         appreciate, even if it's not, quote/unquote, "signed" by you

19         now but if maybe you could adopt it orally and that way there

20         is confidential information that we can -- aren't confidential

21         and use.

22              And also I wanted to make sure that no one -- no

23         non-parties on the case because, you know, this will be a

24         clear the courtroom type thing in our view, at least on the

25         information we would need to actually discuss some of the

1    issues accordingly.

2         THE COURT:  Okay.  Okay.  So is there any -- and so

3    there's agreement with respect to a protective order being

4    needed in this case?  Does everybody agree?  Defendants?

5         MR. CRESCENZO:  Yes, Your Honor.

6         THE COURT:  Okay.  So if everyone's in agreement,

7    then I will enter the protective order.  It is Docket Entry

8    Number -- one second -- I just need to pull it up -- well,

9    I'll just have the minute entry reflect that the docket entry

10   submitted by the parties in the Court -- to the Court is

11   approved and the Court will enter the order this afternoon.

12   So that's done.

13        Anything else that the parties agree on that might

14   help us move forward this afternoon?

15        (No audible response.)

16        THE COURT:  Okay.  Then what I need you to do,

17   Counsel, with respect to the injunction hearing is I

18   understand the arguments, I understand the trade secret

19   issues, I understand the case law.  All I need to do is hear

20   the parties' testimony and determine the credibility of that

21   testimony, and if I have any questions, I'll ask you for

22   argument, but other than that, that's how we'll proceed.

23        So if the movant would like to call their first

24   witness.

25        MR. LOMBARDINO:  Okay.  Thank you.

1    And, Your Honor, I'd like to give courtroom

2  experience to younger attorneys, and so Ms. Gad will be

3  handling this part of the hearing if that's okay with you.

4    THE COURT:  Great.  Welcome, Ms. Gad.  It's all

5  yours.  You may call your first witness.

6    MS. GAD:  Thank you, Your Honor.

7    I call Mr. David Roesler.

8    THE COURT:  Okay.  Mr. Roesler, if you could raise

9  your right hand, sir.

10    (Witness sworn.)

11    THE COURT:  Thank you.

12    And you may place your hand down and Ms. Gad, you

13  may proceed.

14    MS. GAD:  Thank you.

15                    DIRECT EXAMINATION

16  BY MS. GAD:

17  Q    Mr. Roesler, can you please introduce yourself?

18  A    Yes, so I'm Dave Roesler, I am the Regional Business

19  Director for Thompson Safety.

20  Q    And how long have you been employed with Thompson Safety?

21  A    I was employed October of 2020.

22  Q    And how long have you been the Regional Business

23  Director?

24  A    Since April of 2023.

25  Q    And what are some of your job duties as Regional Business

1    Director?

2    A    So I support the west region and our locations that are

3    located in the West that we service first aid, safety and fire

4    extinguishers.

5    Q    Okay.  In your capacity as Regional Business Director did

6    you supervise or oversee the Defendants, Mr. Jones and

7    Mr. Jackson?

8    A    Yes.

9    Q    Okay.  And we'll come back to that.  But turning to

10   Thompson's business, what is Thompson's business?

11   A    Yes, so we're a van-delivered first aid and safety and

12   fire company and so we protect customers, people and provide

13   life safety equipment to protect their assets as well, and we

14   do that with service technicians.

15   Q    And where is Thompson's headquarters located?

16   A    Houston, Texas.

17   Q    And can you tell us a little bit more about the fire

18   extinguisher business and what that entails?

19   A    Yes, so it involves monthly and annual inspections and

20   recertifications for fire extinguishers, maintenance of those

21   at respective intervals, and taking care of the customer.

22   Q    And does Thompson have locations outside of Texas?

23   A    Yes.

24   Q    Can you name just a few?

25   A    Yes, so Albuquerque, New Mexico; Phoenix, Arizona;

1    Denver, Colorado; Missouri.

2    Q    And how does Thompson foster and build its goodwill with

3    its customers?

4    A    Yes, so I guess a number of different ways.  You know, we

5    have flat-rate billing, you know, transparency of invoicing,

6    you know, maintaining customer relationships.  And so that

7    comes from providing, you know, excellent customer service,

8    and in our business we call that service excellence.

9    Q    And how does Thompson generate new business?

10   A    So we have an outside sales team that goes out and

11   prospects new business and they in turn transition that trust

12   over to our service organization that maintains that

13   relationship and expands on it.

14   Q    And can you expand a little bit on who the service

15   organization would be within your company?

16   A    Yes, so we have basically service representatives and

17   fire technicians, both of which are customer-facing and

18   service the customers on a routine basis, typically monthly.

19   Q    And how long would you say it takes Thompson to foster

20   and build that goodwill with its customers?

21   A    I mean, I would say it takes quite a bit, it's not -- you

22   can't just, you know, force a relationship.  Right?  So it's

23   something that's built over time and managed and maintained at

24   the service rep level.

25   Q    And turning back to the Defendants, with regards to

1    Mr. Jones what was his job title?

2    A    He also was a fire service technician.

3    Q    And what are some of his job duties as a fire service

4    technician?

5    A    Yes, so he's the face of -- he's the face of Thompson for

6    the customer.  Right?  So he is doing all the routine

7    maintenance, he's tagging extinguishers, and then most

8    importantly maintaining and building that customer

9    relationship.

10   Q    And what about as to Defendant Mr. Justin Jackson?

11   A    The same, yeah, he was a fire technician as well.

12   Q    And are you familiar with a company, Sterling Safety,

13   Sterling First Aid?

14   A    Yes.

15   Q    Okay.  And what is, or what was the relationship between

16   Sterling Safety and Thompson?

17   A    They were a local competitor that did really the exact

18   same services that Thompson provided in the Houston market.

19   Q    Okay.

20          MS. GAD:  And I'm going to bring up on my screen, if

21   I may, Your Honor, what has been marked as Exhibit 1.

22          (Plaintiff's Exhibit No. 1 identified.)

23          MS. GAD:  Oh --

24          THE COURT:  Can you hold --

25          MS. GAD:    -- (indiscernible).

1          THE COURT:  I'm sorry, Ms. Gad, can you hold on?  My

2    case deputy just stepped out, so I can't get down there to

3    give you access to the screen.

4          Do you have it?

5          MS. GAD:  Okay.

6          THE COURT:  I don't think you do.

7          MS. GAD:  I don't.  It's saying it's not sharing.

8          THE COURT:  Right.  She'll be right back.  I'm sorry

9    to interfere with your examination.  We'll take a short

10   recess.

11         Well, is there anything else that you could talk

12   about before that or -- I don't want to cut you off.

13         MR. LOMBARDINO:  For one I guess (indiscernible)

14   good place to pause it.  You know, as part of the TRO there is

15   a turnover requirement for devices and accounts, and that did

16   not happen, and still has not happened.  So I know you wanted

17   to dive right into the testimony, but at some point I would

18   like to address that issue.

19         THE COURT:  Okay.  My case manager's back, Ms. Gad,

20   so she's going to give you access to the screen.

21         MS. GAD:  Okay.

22         THE COURT:  And then you can call up your exhibit

23   when you're ready.

24         MS. GAD:  I see it now.

25         (Pause in the proceedings.)

BY MS. GAD:

Q    May I call you Dave?

A    Yes, yes, you can.

Q    Dave, can you see my screen where it's showing the Asset Purchase Agreement?

A    I can.

      (Glitch in audio at 4:13:19 p.m. to 4:13:24 p.m.)

BY MS. GAD:

Q    -- purchase agreement?

A    Yes.

Q    And to the best of your knowledge is this a true and correct copy of the Asset Purchase Agreement as it relates to Thompson's acquisition of Sterling?

A    Yes.

Q    And as far as you know is the Asset Purchase Agreement maintained by the company in the ordinary course of business?

A    Yes.

      MS. GAD:  And, Your Honor, I'd move to introduce Exhibit 1 into evidence.

            THE COURT:  Does anyone have any objections?

            UNIDENTIFIED SPEAKER:  No objection.

            MR. CRESCENZO:  No objection, Your Honor.

            THE COURT:  Without objection Exhibit 1 is admitted for purposes of this injunction hearing.

            (Plaintiff's Exhibit No. 1 received in evidence.)

1       MR. LOMBARDINO:  And, Your Honor, real quick for

2   housekeeping.  Should I drop the exhibits into the chat or

3   what's the best way to distribute it among everyone?

4       THE COURT:  So everyone doesn't have -- already have

5   a copy of the Asset Purchase Agreement?

6       MR. LOMBARDINO:  No, Your Honor --

7       THE COURT:  It's a pretty critical document it seems

8   like, but nobody -- okay.  I guess the best way to do it is if

9   you have any questions about what's in the document, ask them

10  on cross-examination.

11      And, Ms. Gad, if you can provide a copy of that

12  document to everyone, at your convenience, not now because

13  you're in the middle of examination.

14      MS. GAD:  Yes, Your Honor, I'll do that.

15      THE COURT:  Okay.  And so you may continue.

16      MS. GAD:  Thank you.

17  BY MS. GAD:

18  Q    And now I'm going to turn your attention to Page 1 of the

19  Asset Purchase Agreement.  And specifically Article Q,

20  Purchase and Sale in Paragraph 2.1.

21      What is your understanding of Paragraph 2.1 titled

22  "Assets to be Transferred"?

23  A    That includes, or has a listing of all of the assets that

24  we acquired with the purchase of Sterling.

25  Q    And turning to Page 3, scrolling down at Paragraph O, and

1   I'll give you a little time to review that, what is your

2   understanding of what Paragraph O says?

3   A    Yes, that there's assets, properties, rights that's on a

4   schedule, that's 2.1.

5   Q    Okay.  So I will --

6                (Pause in the proceedings.)

7   BY MS. GAD:

8   Q    So I'm putting up on my screen what has been marked as

9   Exhibit 2, which is titled the "Seller's Disclosure Schedule."

10                Are you familiar with this document?

11  A    Yes.

12  Q    And to the best of your knowledge is this a true and

13  correct copy of the seller's Disclosure Schedule related to

14  the Asset Purchase Agreement?

15  A    Yes.

16  Q    And as far as you know is the seller's Disclosure

17  Schedules maintained by the company in the ordinary course of

18  business?

19  A    Yes.

20                MS. GAD:  And, Your Honor, I move to introduce

21  Exhibit 2, the seller's Disclosure Schedule, into evidence.

22                THE COURT:  Any objections to Exhibit 2?

23                MR. CRESCENZO:  I'd object (indiscernible) without a

24  copy it's hard to say.  It's on the basis (indiscernible)

25  copy prior to today.  But other than that, that's my only

1    basis.

2         MS. GAD:  I'm sorry, I couldn't really hear.

3         MR. CRESCENZO:  It's the first time we're seeing the

4    document.

5         THE COURT:  Okay.  Well, can you just scroll down to

6    the very -- the signature block, and then -- just hold your

7    spot, but scroll down to the signature block of the document.

8         MR. LOMBARDINO:  And just for the Record I did

9    receive an email and there's one too to defense counsel.

10         THE COURT:  Okay.  Great.

11         MS. GAD:  The Disclosure Schedule doesn't have a

12    signature block.

13         THE COURT:  Okay.  Oh, that's true, it's an

14    attachment.  Okay.  Never mind.  I was going to say if you

15    recognize the signatures, that this was attachment to.  But

16    that's okay, I'm just going to let you go.

17         Respectfully the objection's overruled, and,

18    Ms. Gad, you can go back to what you were doing.

19         MS. GAD:  Thank you.  Thank you, Your Honor.

20    BY MS. GAD:

21    Q    And the pages are not numbered, but I'll turn to what is

22    the third page of Exhibit 2, which is the Schedule 2.10 that

23    we were just discussing.  Is that correct?

24    A    Yes.

25    Q    And what is your understanding of this first table here?

1   A    That was the acquisition of Sterling First Aid and Fire

2   Safety.  We acquired enforceable non-compete and employee

3   agreements filed with that purchase.

4   Q    And are Mr. Jackson's and Mr. Jones' non-compete

5   agreements listed on this table?

6   A    They are.

7   Q    Okay.  So based on the transaction documents we just

8   reviewed, the Asset Purchase Agreement and the seller's

9   disclosure, what is your understanding as to what happened

10  with Mr. Jones' and Mr. Jackson's non-compete agreements after

11  the acquisition?

12  A    That they were transferred and enforced by Thompson -- at

13  Thompson Safety.

14           MS. GAD:  Okay.  I'll stop sharing.

15           And, Your Honor, the Sterling employment agreements

16  at issue for Mr. Jones and Mr. Jackson have already been

17  established by Mr. Roesler's Declaration.  To save time would

18  you allow us to admit them into evidence formally as

19  Exhibits 3 and 4?

20           THE COURT:  Any objections?

21           MR. CRESCENZO:  I'm sorry, which exhibits were

22  that -- was that?

23           MS. GAD:  They'll be Exhibits 3 and 4, the --

24  respectively, so the employment agreements from Sterling for

25  Mr. Jones and Mr. Jackson.

1          MR. CRESCENZO:  Okay.  Thanks.

2          No objection.  Yeah, no objection.

3          MS. GAD:  And similarly, Judge --

4          THE COURT:  Without objections they're admitted.

5          MS. GAD:  Thank you.

6          THE COURT:  Without objections, they're admitted.

7      (Plaintiff's Exhibit Nos. 3 and 4 identified and received

8  in evidence.)

9          MR. LOMBARDINO:  And for the Record, I'm emailing

10  Exhibits 3 and 4 right now.

11          MS. GAD:  And similarly, Your Honor, the Thompson

12  employment agreements have already been established by

13  Mr. Roesler's Declaration.  May we admit those formally as

14  Exhibits 5 and 6?

15          THE COURT:  The witness (indiscernible) --

16          MR. CRESCENZO:  Okay.  No objection.

17          THE COURT:  Okay.  They are admitted.

18      (Plaintiff's Exhibit Nos. 5 and 6 identified and received

19  in evidence.)

20          MR. LOMBARDINO:  Your Honor, for the Record

21  Exhibits  5 and 6 have been emailed (indiscernible).

22          THE COURT:  Do you need access, Ms. Gad, or --

23          MS. GAD:  No, I'm so sorry, it's -- it's not showing

24  up exactly how to share my screen.

25          Okay.  I'm going to try it again.  Sorry for the

1    technical difficulties.

2              THE COURT:  No, no problem.

3              MS. GAD:  Okay.

4    BY MS. GAD:

5    Q    So as to Exhibit 3, Mr. Roesler, I'm going to turn your

6    attention to the third page of the agreement, the non-compete.

7    And so it's your understanding is the non-compete provision

8    contained here, that was acquired by Thompson through the

9    acquisition of Sterling.

10   A    Correct.

11   Q    And similarly with Mr. Jackson.

12   A    Correct.

13   Q    And so after the acquisition with Sterling what company

14   did Defendants Mr. Jackson and Mr. Jones work for?

15   A    For us, Thompson Safety.

16   Q    And how did their job change after the transaction?

17   A    It didn't, they were -- they maintained fire technician

18   status and continued to service customers.

19   Q    And did they continue servicing new customers?

20   A    Yeah, so they would also service Thompson Safety

21   customers, legacy Thompson Safety customers as well.

22   Q    Okay.  And as far as you know, you know, what documents

23   did the Defendants sign when they became employees of

24   Thompson?

25   A    They signed our employee agreements as well

1    (indiscernible).

2    Q    And as far as you know what is the purpose of those

3    employment agreements with Thompson?

4    A    To protect our intellectual property, to protect our

5    customers, you know, protect our business.  Right?  As well as

6    really like allowing -- if there were any transitions for

7    customers, really like a cool down period for us to continue

8    building and maintaining that relationship.

9              THE COURT:  Ms. Gad, can I -- can I just

10   ask Mr. Roesler a quick question?

11             MS. GAD:  Yes.

12             THE COURT:  Mr. Roesler, in the covenants that we're

13   talking about I notice that the radius was 200 miles.  Can you

14   tell me -- or can you understand why the number 200 was come

15   up with?  Was there a reason why it's 200 miles, as opposed to

16   50 or 100 or 500?  Do you have any knowledge as to why it's

17   200?

18             THE WITNESS:  To clarify are you -- you're talking

19   about the Sterling agreement that we acquired?

20             THE COURT:  Yes.

21             THE WITNESS:  So the idea really behind a radius

22   that large is we've got a lot of customers that have multiple

23   locations, multiple sites outside of Houston.  They could be

24   up in Dallas, they could be, you know, in other states as

25   well.  And just, again, to protect -- protect our customers

1    and our interests.

2            THE COURT:  Thank you, Mr. Roesler.

3            Ms. Gad, you may continue.

4            MS. GAD:  Thank you.

5    BY MS. GAD:

6    Q    As to Mr. Jones, when did you learn that he would be

7    leaving Thompson?

8    A    End of March, or like I think -- I believe it was

9    March 21st.

10   Q    Okay.  And did he provide any sort of notice period?

11   A    He did a provide us 2-week notice.

12   Q    Did he withdraw that notice period?

13   A    He did not.

14   Q    So when was his actually last day of work at Thompson?

15   A    I believe it was March 25th.

16   Q    And then as to Mr. Jackson when did the company learn

17   that he would be leaving Thompson?

18   A    What was that?

19   Q    As to Mr. Jackson when did the company learn that he

20   would be leaving Thompson?

21   A    It was shortly thereafter.  (Indiscernible).

22   Q    And so what did you discover after Mr. Jones' last day of

23   employment with Thompson?

24   A    So I mean, we ended up finding a fire tag at one of --

25   from his new competing business, that he started his own

1   competing business, and that he had emailed our confidential

2   pricing files from Thompson Safety email to his personal

3   email.

4   Q    Okay.  And let's go through Mr. Jones line-by-line.  You

5   mentioned that you discovery he'd formed his own company.

6   When did you discover that he started his own company?

7   A    Almost right after he had left.  We had -- we had

8   discovery obviously with that -- with the fire tag that had

9   his license number we were able to see that he is -- every

10  fire technician has a Texas Fire Marshal Class B fire license

11  and every company that does fire work has an ECR number, which

12  is it's basically like your fire license for the company.  And

13  his license, his personal license was transferred to another

14  ECR number which we ended up discovering was his business,

15  Jones Fire and Safety.

16  Q    And how did you learn that that was his business?

17  A    Because we found the fire tag that had Jones on there,

18  and then obviously we did a little bit more digging and then

19  we found on the Secretary of State's website that he had

20  created a new business in January.

21  Q    Okay.  And then you mentioned -- you mentioned the

22  inspection tag that you discovered in March.

23  A    Yes.

24  Q    I'm going to share my screen again, I'm going to try.

25       (Pause in the proceedings.)

1    BY MS. GAD:

2    Q    Okay.  I'm bringing up my screen on what has been marked

3    as Exhibit 8.

4         It doesn't scroll down, but can you tell me what this

5    document is?

6    A    Yes, so these are pictures of fire extinguishers at

7    customer sites that we were attempting to go service on our

8    regular scheduled frequency and come to find out that they

9    were serviced by Jones Fire Protection before we were able to

10   complete the work.

11   Q    Okay.  Please --

12        (Glitch in audio from 4:27:43 p.m. to 4:27:52 p.m.)

13        THE WITNESS:   -- our North Houston location.

14   BY MS. GAD:

15   Q    And as far as you know, the picture is an accurate

16   reflection of what was being photographed through the fire

17   technician's --

18   A    Yes, yes.

19   Q    -- tag?

20   A    Yes, so Andrew was able to pull the data, on the

21   left-hand side is meta data and I'm not going to pretend to

22   know all the nuances of that, but basically it's the

23   encryption of the picture so it proves where that picture was

24   taken because obviously you can't tell with the fire tag of

25   where that picture was taken, so this is the proof of where

1   that was taken.

2          MS. GAD:  And, Your Honor, so I move to admit what

3   has been labeled as Exhibit 8 into evidence.

4          MR. CRESCENZO:  No objection.

5          UNIDENTIFIED SPEAKER:  No objection, Your Honor.

6          THE COURT:  Okay.  Without objection the exhibit is

7   admitted.

8          (Plaintiff's Exhibit No. 8 received in evidence.)

9          MR. LOMBARDINO:  And for the Record I just emailed

10  defense counsel Exhibit 8.

11         THE COURT:  Thanks, Mr. Lombardino.

12  BY MS. GAD:

13  Q    And so for this first inspection tag can you explain the

14  information contained on the tag and explain the significance

15  of the date?

16  A    Yeah, so if you notice the hole punch is on the right

17  hand side, it proves that there was maintenance done on the

18  extinguisher and that it was tagged March of 2024.  So that

19  means the service was completed in March of 2024, strongly

20  indicating that this was probably tagged while he was still

21  employed at Thompson Safety.

22  Q    Okay.  And so after finding this initial inspection tag

23  in March, what steps did the company take to address the

24  issue?

25  A    So we -- obviously when we found out that he had done

1    this, we were -- we were attempting to get in front of our

2    customers to see if we could make sure that he wouldn't be

3    able to steal any more customers.

4    Q    Did you address the Defendants in any way about --

5    A    Yeah --

6    Q    -- about the issue of the different --

7    A    -- we did, we sent a cease and desist almost immediately

8    after discovering this tag.

9    Q    And what happened during the course of that cease and

10   desist, did you get a response?

11   A    Our attorneys spoke to his attorneys, yes.

12   Q    And do you know what resolution the parties came to after

13   that call?

14   A    Yeah, so our management team at Thompson basically took

15   like a wait and see approach, and so hoped that with that

16   cease and desist letter that it wouldn't continue to make sure

17   that we weren't having any more customers stolen from us, so

18   we took a wait and see approach.

19   Q    Okay.  So even after that cease and desist and the

20   communication with counsel, what did you continue to find?

21   A    More fire tags at customers that we were going to service

22   that had already been completed.

23   Q    And what months were those for?

24   A    April, May and even into June.

25   Q    And to be -- how many customers are you aware of that

1    Thompson has lost to Jones Fire?

2    A    At least 20.

3    Q    And similarly with this March 2024 inspection tag, how

4    did Thompson discover that these customers were seen by Jones

5    Fire?

6    A    Because when our technicians would make our regularly

7    scheduled visits to go see these customers, they had already

8    been completed.

9    Q    And then you mentioned that you discovered he emailed

10   himself a pricing list.

11        (Pause in the proceedings.)

12             THE COURT:  Do you need access, Ms. Gad, or --

13             MS. GAD:  I have it.  Sorry, it's just --

14             THE COURT:  Okay.

15             MS. GAD:   -- it's a little slow to pull up.

16             THE COURT:  No problem.

17   BY MS. GAD:

18   Q    Okay.  So I'm bringing up my screen at what has been

19   marked Exhibit 7.

20        Do you recognize this document?

21   A    I do.

22   Q    And what is it?

23   A    this is the email that Jace sent from his Thompson Safety

24   email address to his personal email address with our

25   confidential pricing information and pricing file.

1    Q   Okay.  And is this a true and correct copy of that email

2    and Thompson's pricing list?

3    A   Yes.

4    Q   And was this document maintained in the ordinary course

5    of business?

6    A   Yes.

7         MS. GAD:  And, Your Honor, I move to admit what has

8    been marked as Exhibit 7 into evidence.

9         MR. CRESCENZO:  Your Honor --

10        THE COURT:  Any objections?

11        MR. CRESCENZO:  -- yes, Your Honor, I object.  This

12    is Joe Crescenzo for Defendant Jace Jones.  I believe that the

13    confidential marking on that document is not on the document

14    that was previously provided to Mr. Jones.  I believe it has

15    been added for the purposes of this lawsuit after the fact.

16        THE COURT:  Okay.

17        MR. CRESCENZO:  I would object to it being a true

18    and correct copy.

19        THE COURT:  Okay.  Well, I'm going to overrule the

20    objection, allow the document admitted, and then on cross-

21    examination or on direct you can take up the issue, either

22    with Mr. Roesler or with -- when your client takes the stand.

23    But for now the objection is overruled and the document is

24    admitted.

25        (Plaintiff's Exhibit No. 7 received in evidence.)

1          THE COURT:  And the other thing is, well, whether

2     it's marked confidential or not, that document, if it was

3     recieved, has all the hallmarks that the 5th Circuit said that

4     indicates that the document would be confidential.  It's not

5     just names, I mean, it's pricing information, specific items,

6     this is -- even if it wasn't marked confidential, it would be

7     confidential.  So, but you guys can take it up on cross-

8     examination.

9          MR. CRESCENZO:  Thank you.

10          I intend to take it up on cross.  Thank you.

11          MR. LOMBARDINO:  And I can clear that -- just clear

12     it up so there's no misunderstanding, and if you still want to

13     take it up on cross, you can.  But it was marked confidential

14     today for purposes of the protective order.  So we're not

15     contending that it was -- had been stamped confidential before

16     the hearing.  That's really the -- but they can say what they

17     want to.

18          THE COURT:  Okay.

19          MR. CRESCENZO:  Well, right, and that was the

20     objection, Your Honor.  I wasn't objecting that it couldn't be

21     confidential information otherwise.  I just wanted to clarify

22     what Mr. Lombardino said, and that's --

23          THE COURT:  Okay.

24          MR. CRESCENZO:   -- that's sufficient for me.  Thank

25     you.

1          THE COURT:  Sounds great.

2          Okay.  Ms. Gad, you're still on.

3          MR. LOMBARDINO:  Oh, one more just for the Record, I

4     emailed Exhibit 7 to defense counsel.

5          THE COURT:  Okay.  Thank you, Mr. Lombardino.

6     BY MS. GAD:

7     Q    And, Dave, when did you discover that Mr. Jones emailed

8     himself this pricing list?

9     A    Right after he was -- basically after he was terminated

10    when we started doing digging where we found tags and wanted

11    to kind of understand, okay, if he started his own business,

12    what else, you know, what else was there.  Right?

13    Q    And is there any business reason why a fire technician

14    like Mr. Jones would need to email himself a pricing list to

15    his personal email account?

16    A    I mean, nothing that I can think of, unless you wanted to

17    start your own company and, you know, undercut your previous

18    employer by a couple of bucks to gain business.

19    Q    And that gets to my next question, which is like how

20    would, you know, the unauthorized use or disclosure of this

21    pricing list harm Thompson?

22    A    I mean, significantly.  Right?  I mean, if -- it allows

23    them to break trust with our customers and be able to have

24    conversations about, you know, anything really related to our

25    pricing.  I mean, that's confidential information.

Q    And how much time and money was spend developing this
pricing list?

A    You know, quite a bit, but it's ongoing, too.  Right?
We, you know, we spend a lot of time with our pricing on an
annual basis making sure that we're competitive in the market,
making sure that we're doing our best by our customers.  And
so our executive leadership team meets, and I mean, you saw
the line items there, we're going through those individually
making sure we're looking at our costs and understanding what
our margins are, so quite a bit.

Q    And so you mentioned that inspection tags were found at
Thompson customer sites.  To the best of your knowledge how
would Defendants know to service these customers for their
annual inspections?

A    So customers are on a scheduled frequency, so unless
they've got -- you know, they can memorize dates and customers
and all that kind of stuff.  We have a -- that we acquired
with Sterling, route cards, and so these route cards had a ton
of information on them and basically allows -- gives you when
the customer is due and all sorts of other information.

Q    And I am bringing up on my screen what has been marked as
Exhibit 9.

     Do you recognize this document?

A    I do.

Q    And is this a copy of a customer route card that you were

1    just referring to?

2    A    It is -- that is correct.  This is the first account that

3    we I think realized we lost.

4    Q    And is this a true and correct copy of an example of a

5    customer route card?

6    A    Yes.

7    Q    And is this maintained in the ordinary course of

8    business?

9    A    Yes.

10        MS. GAD:  And so, Your Honor, I would move to admit

11   Exhibit 9 into evidence.

12        MR. CRESCENZO:  No objection.

13        UNIDENTIFIED SPEAKER:  No objection, Your Honor.

14        THE COURT:  Without objection the exhibit is

15   admitted.

16        (Plaintiff's Exhibit No. 9 received in evidence.)

17   BY MS. GAD:

18   Q    And so, Mr. Roesler, can you -- can you walk us --

19        MR. LOMBARDINO:  I've emailed Exhibit 9 to defense

20   counsel.

21        MS. GAD:  Thank you.

22        MR. LOMBARDINO:  Sorry.  Sorry, Ms. Gad.

23   BY MS. GAD:

24   Q    Can you walk us through the information contained in this

25   customer route card?

1    A    Yeah, so it has the customer name obviously, bill to

2    address of where that customer is billed, and contact names

3    and numbers, it obviously shows first invoice dates, what was

4    on the initial order, this one particularly shows the number

5    of fire extinguishers that that customer has, special

6    instructions, so this has pricing so what the annual cost is,

7    service charges, all that good stuff.

8         And then it has most importantly the schedule on the

9    bottom so you know when to service that customer.  So if you

10   look at the left-hand side, it shows March obviously dating

11   back to 2015.  These customers -- this customer is serviced in

12   March.

13   Q    Thank you.

14        And so walk us through kind of up to present day.  Have

15   you received any report of Defendant's activity even after the

16   TRO was entered in this case?

17   A    Yes.  So we had a customer reach out to us after the TRO

18   was in place that basically said, you know, that Jace had

19   called them, gave them a sob story of how, you know, Thompson

20   Safety is suing him to try to gain that business.  Also

21   mentioned that we used unlicensed fire technicians to service

22   fire extinguishers, and, you know, tried to -- tried to run

23   that business even after the TRO was in place.

24   Q    And so with the discovery of, you know, the inspection

25   tags and getting information from this client about they're

1    post-TRO activity, how has Thompson been harmed by Defendant's

2    actions?

3    A    I mean, I would say a couple of different things.  Right?

4    Our reputation, if you have somebody -- you know, your

5    competitor running around telling you that -- you know, lies

6    about our service technicians doing -- our fire service

7    technicians doing work without licensing, obviously our

8    competitors having our pricing and confidential information,

9    and most importantly our customer relationships.  Right?  I

10   mean, we have -- we now have customers that may never do

11   business with us again based either on a lie or understanding

12   of pricing and they may never come back.

13   Q    Thank you, Mr. Roesler.

14            MS. GAD:  Your Honor, I pass the witness.

15            THE COURT:  Okay.  Counsel, before we have cross-

16   examination.

17        (Pause in the proceedings from 4:41:15 p.m. to

18   4:43:15 p.m. as Judge attends another case.)

19            THE COURT:  Okay.  Counsel for the Defendants, each

20   of you may cross Mr. Roesler at this time.  Just tell me who's

21   going to start so I can keep a clean Record.

22            MR. CRESCENZO:  Thank you, Judge.

23            This is, again, Joe Crescenzo for Defendant Jace

24   Jones.  I'll begin the cross-examination.

25            THE COURT:  Okay.  You may -- oh, Counsel, you need

1    to speak up because the ERO can barely hear you.  So either

2    you need to move the microphone closer to you or speak up so

3    we can keep the Record.

4         MR. CRESCENZO:  I apologize.  Is this better?  Can

5    you hear me better?

6         THE COURT:  Yes.  Perfect.

7         MR. CRESCENZO:  Okay.  I was speaking too softly.

8                    CROSS-EXAMINATION

9    BY MR. CRESCENZO:

10   Q    So, Mr. Roesler, it's my understanding that in this case

11   one of the bits of confidential information that you believe

12   that Thompson has is the fact that you -- that Thompson

13   services certain businesses for their fire extinguisher needs.

14   Is that correct?

15   A    Can you repeat that?

16   Q    Yes, sir, I apologize.

17        You've indicated that the identity of Thompson's

18   customers is a -- is confidential information that you are

19   seeking to keep confidential.  Is that correct?

20   A    The identity of our customers?

21   Q    Yes, sir.  It's my understand that's one of the bits of

22   confidential information that --

23   A    I would say -- are you referring to like -- like the

24   customers themselves?

25   A    Yes, yes, sir, because I mean, you've -- you've alleged

1    that the Defendants have taken the confidential information

2    which includes the identity of their customer -- of your -- of

3    Thompson's customers so they know who to go service.  So my

4    understanding is --

5        THE COURT:  Let me just cut to the -- let me -- let

6    me just cut to the chase, my understanding is that's not what

7    the pleadings say.  The pleadings -- it's not just the

8    customers, it's the customers and the information relating to

9    those customers.  So it's not -- the name of the customer is

10   not what Mr. Roesler is contending about.

11       Because I've read this, the motion, it's not the

12   names, it not the identity alone, it's the identity plus the

13   information regarding Mr. Roesler's company'S servicing of

14   those customers.  So I mean, I'm just trying to move it along.

15   I get what your argument or your question is, but that's not

16   what he said and it's not what's in the pleadings.

17       The pleadings say --

18       MR. CRESCENZO:  Okay.

19       THE COURT:   -- it's not the identity alone, it's

20   the identity plus the information related those individuals --

21       MR. CRESCENZO:  I understand this, Your Honor.

22       THE COURT:   -- (indiscernible).

23       MR. CRESCENZO:  I completely understand that, Your

24   Honor, and I was simply -- given the time of day, I will

25   endeavor to speed things up, I was simply trying to walk him

1    through his testimony.  He told --

2          THE COURT:  No, no problem.  No problem.  You go as

3    long as you need.

4          MR. CRESCENZO:  Thank you, Judge.

5    BY MR. CRESCENZO:

6    Q    The point that I was trying to make is we were shown an

7    exhibit of a fire tag on a fire extinguisher that is one way

8    in which Thompson discovered that Jones Fire had serviced

9    particular customers, and that from looking at the photo it

10   looked like there was additional information on that tag as

11   well, which included when the customer was last serviced.

12         And so my question would be, if Thompson was able to

13   find that information by simply walking into their -- who they

14   believe their customers were, how that information could be

15   considered confidential, and so my question is, how -- why

16   would you believe that that information is confidential?

17   A    It would be amazing if you can walk into a customer at

18   any given point and find a customer tag.  These are customers

19   that we had scheduled frequencies that we were meant to go to

20   service, and they were already done first hand.

21   Q    But couldn't you walk into -- well, first of all, don't

22   most businesses and buildings, aren't they required by law to

23   have fire extinguishers in various areas of the building, in

24   public areas?

25   A    Yes.

1    Q    Well, then what would prevent anyone from doing this

2    business, from walking in and discovering that particular type

3    of information?

4    A    What would prevent them?

5    Q    Correct.

6    A    I guess nothing but I think the biggest point there is

7    we're talking about 20 customers that we serviced that when we

8    showed up to service were already completed by Jones Fire

9    Protection.

10   Q    Did you have contracts with those customers?

11   A    We acquired those customers with the acquisition of

12   Sterling.

13   Q    Okay.  Did -- so as part of the Asset Purchase Agreement,

14   I haven't had a chance to read it, but is it your contention

15   that there were customers with contracts that were included as

16   part of that agreement?

17   A    So I would say that --

18        MR. LOMBARDINO:  Objection; calls for legal

19   conclusion.

20        THE COURT:  I'm sorry, I couldn't --

21        MR. LOMBARDINO:  Sorry.  I said, objection, it calls

22   for a legal conclusion.

23        MR. CRESCENZO:  I believe he's already testified

24   that there were contracts that came with the Asset Purchase

25   Agreement.

THE COURT:  Yeah, I'm going to overrule the
objection.  I think Mr. Roesler can answer the question.  It
doesn't really call for a legal conclusion, but he's not being
asked about the legal effect of the contracts, he's just
asking what his understanding of what he got out of the
acquisition.

So, objection is overruled, Mr. Roesler can answer
the question.

THE WITNESS:  So it's my understanding that we, when
we acquired these customers there may or may not have been
contracts in place.

BY MR. CRESCENZO:

Q    Okay.  So as we sit here today you cannot testify one way
or the other whether or not the Asset Purchase Agreement
included contracts for Sterling customers?

A    We acquired customers with Sterling on scheduled
frequencies, and -- but whether or not they had contracts --

Q    Thank you.

So the customers -- to your knowledge the customers were
free to leave at any time if they were unhappy with Thompson
services?

A    Yeah.

Q    Did any of those customers -- were they required to your
knowledge to sign a non-disclosure agreement with respect to
pricing?  And I will clarify, when I mean, pricing, that the

1    pricing that they were getting charging by Thompson or

2    Sterling?

3    A    So you're talking about our confidential pricing?

4    Q    Yes.

5    A    And the question is, one more time?

6    Q    The question is were they required to sign any documents

7    that prevented them from disclosing that information to third

8    parties?

9    A    No.

10   Q    So I understand that one part of Thompson's business is

11   the fire extinguisher business.  That's correct?

12   A    Yes.

13   Q    And then looking at your affidavit in support of the

14   injunction, you had also listed first aid, safety supplies,

15   and personal protective equipment, automated external

16   defibrillators, eye wash, fire extinguishers, other protective

17   fire protection services, training services and overall

18   management of their safety programs.

19        My question is given the -- what percentage, and I know

20   you won't have a precise amount, but what would you estimate

21   is the amount of work that Mr. Jones and Mr. Jackson did

22   relative to the whole scope of Thompson's business interests?

23   A    What percent?

24   Q    Yeah, because it's -- I know Thompson seems to provide

25   more services than what the Defendants provided.  So I was

1    curious as to how much of Thompson's business was generated by

2    the jobs performed by the Defendants.

3    A    So we have -- we have 12 routes that are north of Houston

4    so whatever 2 out of 12 is.  Maybe we had 13 at the time, I'd

5    have to go back and check, but North Houston had 13 reps --

6    routes, and they were 2 of them.

7    Q    Okay.  And is that simply for the fire extinguisher

8    services that you're talking about?

9    A    No, for the fire extinguishers they worked 50 percent.

10   Q    Okay.

11   A    Because we had 2 other service reps -- 2 other fire

12   technicians.

13   Q    Okay.  Okay.  Now you had mentioned, going back to the

14   Sterling agreement for a second, that the reasoning for the

15   200-mile radius for -- of non-competition was based on

16   protection of goodwill and things of that nature.  That's

17   correct, just so I'm restating your testimony accurately?

18   A    I recall the 200 miles is for the -- if we have a

19   customer that's, you know, in Conroe, Texas, and has other

20   locations outside of that, you know, there's a potential to

21   lose that business as well.

22   Q    Okay.  So that's your understanding of the Sterling

23   agreement.  But did you -- do you have personal knowledge of

24   -- were you personally involved in writing the Sterling

25   agreement?

1    A    I was not.

2    Q    Thank you.

3         So I understand you may have your reasons for trying to

4    enforce that, but you don't know specifically why Sterling had

5    that specific range in their agreement?

6    A    (No audible response.)

7    Q    Did Thompson provide the Defendants with a phone?

8    A    No, we provided a cell phone stipend.

9    Q    Okay.  Did you provide them with a personal computer?

10   A    I do not believe -- there was one at the -- there was a

11   couple of computers like at the location, but, no.

12   Q    Okay.  Did they manage anybody, meaning did they have

13   anybody under them?

14   A    Besides the management of the customers?

15   Q    Yes, besides that.

16   A    No.

17   Q    Did all of the employees at Thompson, were they required

18   to sign a confidentiality agreement?

19   A    An employee agreement, yes.

20   Q    And to your knowledge is the -- is the scope of that non-

21   competition agreement the same?

22   A    To my knowledge.

23   Q    Is it your testimony that if you're providing the same

24   amount of confidential information to everybody in the company

25   that it's really confidential information?

1    A    I don't understand the question.

2    Q    So, okay, let me -- let me back up.

3         Did you provide -- are all of the employees of Thompson

4    provided with the same confidential information as the others?

5    A    Repeat that one more time.

6    Q    I'm sorry.

7    A    Yeah.

8    Q    Were Mr. Jones and Mr. Jackson provided with confidential

9    information that differs from the information that may have

10   been provided to other employees who signed the same employee

11   agreement?  To your knowledge.

12        MS. GAD:  Your Honor, I object to the relevance of

13   that question.  We're only here looking at Mr. Jones' and

14   Mr. Jackson's employment agreements.

15        MR. CRESCENZO:  Your Honor --

16        THE COURT:  The objection's overruled.  The

17   objection's overruled.  I don't need to hear argument.

18        I get your argument is, if it's confidential -- if

19   it's confidential information, shouldn't it be confidential to

20   everyone, not specific people if it's truly confidential.

21   That's what you're trying to get at.  So I just need to get an

22   answer.

23        THE WITNESS:  So, yeah, so if that's the question,

24   then, yes, everybody has the same confidentiality agreement.

25   BY MR. CRESCENZO:

1   Q    Okay.  And everyone was provided with the same

2   confidential information?

3             THE COURT:  Well, that doesn't make sense --

4             THE WITNESS:  No.

5             THE COURT:   -- because, yeah, that -- yeah, okay,

6   never mind.  The answer's clearly no because people have

7   different information based on where they worked in the firm.

8   I mean --

9             THE WITNESS:  Yeah.

10             THE COURT:   -- but --

11   BY MR. CRESCENZO:

12   Q    Okay.  So looking at the confidential information that

13   was listed in Paragraph 16 of your affidavit, Mr. Roesler, you

14   indicated that the Defendants were provided with information

15   about Thompson's business and business model.  Correct?

16   A    I don't recall that specific paragraph or, you know --

17   Q    Okay.  Well, would you agree with that statement, that

18   they were provided with information about the business model

19   of Thompson?

20   A    Yes.

21   Q    Okay.  And supplier and pricing information, you would

22   agree that they were provided with that information as well?

23   A    Yeah.

24   Q    And customer information including customer preferences,

25   order history, pricing and margin information?

1   A    Yes.

2   Q    Can you point to a business purpose why the technicians

3   would need information on margins?

4   A    The question is why do they need information on margins?

5   Q    Yes, sir.

6   A    To have margin integrity so we're selling things above

7   cost to --

8   Q    Did they have any control over the pricing?

9   A    Yes.

10  Q    Okay.  So they had discretion on setting the pricing for

11  specific customers.

12  A    Because of the acquisition of Sterling there were

13  differences.

14  Q    What kind of differences?

15  A    Because we acquired those customers.

16  Q    Okay.  So the differences in pricing?  I'm sorry --

17  A    Yeah --

18  Q     -- I'm just trying to clarify.  You said that they were

19  differences, and they were based on the fact that you acquired

20  the Sterling customers.  And the pricing -- I'm thinking the

21  difference that you're talking about is the difference in the

22  pricing between Sterling and the Thompson customers.  Is

23  that -- is that a fair statement?

24  A    Yeah.

25  Q    Okay.  Were the Defendants responsible for acquiring new

1    customers?

2    A    No, they were not.

3    Q    Okay.  My understanding is there's an account rep team

4    that was responsible for that?

5    A    Yes, we have an outside sales team.

6    Q    Is there any special way that Thompson requires its

7    technicians to service fire extinguishers?

8    A    Ask that again, please?

9    Q    Is there any special way that Thompson requires its

10   technicians to service fire extinguishers?

11   A    We, I mean, we do things sometimes a little bit different

12   than our competition.

13   Q    Okay.  So the answer -- then your answer is yes.

14   A    Yeah.

15   Q    And I'm assuming that you're referring to pricing.  As

16   far as the technical aspect of servicing the extinguishers is

17   there anything special about what Thompson requires the

18   technicians to do?

19   A    A little bit, yeah.  So we do an even exchange program

20   which is -- which is like an even exchange opt-out of

21   extinguishers versus like doing them in the field.  So we have

22   some special ways to go about doing that, yes.

23   Q    Okay.  Do you believe that Jones and his business does

24   the even exchange that you just described?

25   A    I'm not sure.

1    Q    I don't have too much more, Mr. Roesler.

2         So regarding the pricing list that Mr. Jones emailed to

3    himself, you don't have any knowledge that he used any of that

4    pricing at Jones Fire, do you?

5    A    I understand -- I actually haven't.

6    Q    Do you require your technicians to know Thompson's

7    pricing?

8    A    Yeah, they know it when they're servicing customers.

9    Q    Had pricing -- had pricing recently changed since this

10   was in January of 2024?

11   A    Yes.

12   Q    Is there anything -- was Mr. Jones ever instructed not to

13   email himself the pricing list?

14   A    Personal email?

15   Q    Correct.

16   A    Yeah, it's inappropriate.

17   Q    Would it be inappropriate if he did not misuse it and

18   just printed it out to use it for help servicing Thompson's

19   customers?

20   A    Yeah, I think it's inappropriate.

21   Q    Okay.  But -- okay.

22              MR. CRESCENZO:  Thank you Mr. Roseler.

23              I'll pass the witness at this time.

24              THE COURT:  Next defendant?  Counsel, for the next

25   defendant.  You may proceed when ready.

1          (Court attends an unrelated matter from 5:04 p.m. to

2               THE COURT:  Okay, I think we've got everyone taken

3     care of.  Okay.  You may proceed with your examination of the

4     witness.

5               MR. WINKELMAN:  Sure.  Lee Winkleman, counsel for

6     Justin Jackson.

7                         CROSS-EXAMINATION

8     BY MR. WINKELMAN:

9     Q    Mr. Roesler, did I say that last name correctly?  I want

10    to make sure I got it right.  I don't want to butcher it.

11    Roesler.

12    A    It's Roesler.

13    Q    Wrestler, like wrestling.

14    A    Lone Star Wrestler.

15    Q    Even better.  Excellent.

16         Does Thompson have any specific policies concerning the

17    use of its computer systems?

18    A    Yes.

19    Q    Okay.  And -- but those aren't in evidence in this TI

20    hearing, are they?

21    A    (No audible response.)

22    Q    Have any of those policies been submitting into evidence

23    such as temporary injunction hearing?

24    A    Not that I'm aware of.

25    Q    Okay.  And where are these policies, where do they live?

1    A    In Sharepoint.

2    Q    Okay, what's Sharepoint?

3    A    It's our internal password protected like document

4    storage, if you will.

5    Q    And so is does it contain like an employee handbook, the

6    policies?

7    A    I believe so.

8    Q    Do you require employees to sign off on acknowledgment

9    that they've read it and understand it?

10   A    We have employee agreements that are required to be

11   signed off.

12        MR. WINKELMAN:  Objection, non-responsive.

13   BY MR. WINKELMAN:

14   Q    Do you require the employees to sign off on an

15   acknowledgment saying that they've read the policies related

16   to the computer system?

17   A    I'm not sure what it exactly says that they sign off on.

18   Q    Okay.  Regardless, we -- there have been no

19   acknowledgmentS signed by either Defendants in this case in

20   evidence, correct?

21   A    Apart from their employee agreement?

22   Q    Correct.  There's been no acknowledgment that they've

23   read and signed any policies related to the company's computer

24   system or read and understood?

25   A    Not that I'm aware of.

1     Q   Okay.  Is it your understanding that the Thompson

2     non-compete that it would prevent Jones Fire for doing

3     business with Thompson customers regardless of who solicited?

4         Let me know if you need me to clarify that.

5     A   Yeah, for sure.

6     Q   Okay.  So does -- to your knowledge based on your reading

7     of it, does it prevent Jones Fire from doing business with

8     customers that solicited them for business?

9     A   I would have to go back and read it.

10    Q   Okay.  Wouldn't you agree that if it does, if it does

11    prevent them from doing work if customers who solicit them

12    that it would be unreasonable?

13    A   No, I don't necessarily think that's the case.  They are

14    Thompson's customers.

15    Q   Okay, but if the customer no longer wants to do business

16    with Thompson, and they would prefer to work with Jace or

17    Justin why prevent the customer from working with them?

18    A   Is that because of our -- because they know our pricing.

19    Because they -- what would be the reason there.

20        MR. WINKELMAN:  Objection, non-responsive.

21    BY MR. WINKELMAN:

22    Q   I'll ask the question real simply.  If a customer no

23    longer wants to work with Thompson and would prefer to work

24    with Jace Jones, why prevent the customer -- what interest

25    does Thompson have in preventing the customer from working

1    with them?

2    A    Because we could still potentially save that customer.

3    Q    You could -- right.  You could potentially save the

4    customer, but the customer has lost their goodwill with

5    Thompson, correct?  If they don't want to do business --

6    A    In the scenario -- in this fabricated scenario?  Sure.

7    Q    Okay.  It wouldn't be necessary to protect the goodwill

8    of the customer at that point.

9    A    No, we're protecting the interest of our customers.

10   Q    So would -- my question is pretty straightforward.  Is it

11   necessary to protect the goodwill between Thompson and its

12   customers to prevent customers who no longer want to do

13   business with Thompson, to do business with Jace Jones?

14   A    It's a pretty loaded question if I'm being honest.

15   Q    Can you answer it?

16        THE COURT:  Yeah, it doesn't make sense.  I mean,

17   your question presumes that there's -- that -- I'm going to

18   let you guys take it.  ButI'm going to object.  The objection

19   is the question assumes facts not in evidence.  And is vague.

20        So if you can answer it, more power to you.  I

21   couldn't answer it because it assumes facts that had not been

22   established yet.  One of the factors it assumes that the

23   customers want to leave based on nothing other than the fact

24   that they want another provider.  That's never been

25   established.

1    MR. WINKELMAN:  Right, I'm asking it as a

2  hypothetical.

3    THE COURT:  You guys -- but you guys continue.  It's

4  okay.  I'm just pointing out that -- I know you didn't object

5  Ms. Gad, but I'm objecting because I'm trying to figure out

6  the facts that I need to make the call with respect to whether

7  or not to issue an injunction.

8    None of -- that question doesn't help me get --

9  doesn't get me there.

10    MS. GAD:  I understand.  It was presented as a

11  hypothetical so it confused me.

12    MR. WINKELMAN:  It was a hypothetical.  It's a

13  hypothetical situation, Your Honor.  I'm sorry if I wasn't

14  clear enough on that.

15    THE COURT:  Okay.

16    MR. WINKELMAN:  Okay, well I'm not going to belabor

17  that point any more.  I'll pass the witness.

18    THE COURT:  Okay.  If you could just speak up a

19  little bit, counsel.  Everyone, it's still hard for me to hear

20  over here.

21    Okay, Ms. Gad, Redirect?

22    MS. GAD:  Yes, thank you.

23                    REDIRECT EXAMINATION

24  BY MS. GAD:

25  Q    Dave, does Thompson consider its customers' identities

1    and it's customer pricing confidential?

2    A     Yes.

3    Q     And how could you do business with a customer if you

4    couldn't share your pricing with them?

5    A     Well, you couldn't.  They wouldn't know what they're

6    paying for the services that we provide.

7    Q     And are you aware of any customer of Thompson that has

8    disclosed your pricing?

9    A     No.

10          MS. GAD:  And let's see.  Hold on for one second.

11          I think that's all I have, Your Honor.

12          THE COURT:  Defense counsel, you may ask any other

13    questions.

14          MR. CRESCENZO:  I have no further questions, Judge.

15          MR. WINKELMAN:  I have no further questions, Your

16    Honor.

17          THE COURT:  Great, well, Mr. Roesler, I think let me

18    just back and ask you a quick question.  I think the

19    hypothetical that they were trying to ask you -- the defense

20    counsel was trying to ask you is if customers wanted to leave

21    on their volition, that is they just wanted to go to someone

22    else and nothing had been done to influence them that was

23    unlawful, would you be okay with those customers leaving your

24    company and going with someone else?

25          THE WITNESS:  Yeah.  We'd have to be.  But I think

1        there's a lot of -- I think there's a lot of gray area in that

2        question.

3                THE COURT:  Right, okay.  I agree with you.  I just

4        wanted to get -- that's what they were trying to ask you.

5                MR. WINKELMAN:  You got it right, Your Honor.

6        (Witness steps down.)

7                THE COURT:  Okay, great.  Okay, then Ms. Gad, you

8        may call your next witness.

9                MR. LOMBARDINO:  And I'm actually handle this one.

10       I think we're going to call Mr. Jace Jones, unless he intends

11       (indiscernible) we can just go ahead and call him now after

12       questions and they can ask questions.

13              THE COURT:  Okay.  Well, here's the deal with the

14       witnesses.  When it's been -- when the witness is called, you

15       take the witness and get whatever questions.  And then defense

16       counsel you put on your case-in-chief through the witness once

17       they're called.

18              We're not going to have the witness called for

19       direct on one side and then later called for the other side.

20       So once the witness is called, everybody is going to take the

21       witness for all purposes.

22              MR. WINKELMAN:  That makes sense.

23              THE COURT:  Okay, so Mr. Lombardino, you can call

24       your witness and we can get going.

25              MR. LOMBARDINO:  Okay.  Plaintiff calls Mr. Jones to

1      the stand.

2              (Pause in the proceeding.)

3                  THE COURT:  If you could, Mr. Jones, raise your

4      right hand.

5              (Witness sworn.)

6                  THE COURT:  Okay, you may place your hand down.

7                  And Mr. Lombardino, you may proceed.

8                  MR. LOMBARDINO:  Thank you, Your Honor.

9                          DIRECT EXAMINATION

10     BY MR. LOMBARDINO:

11     Q    Mr. Jones, do you admit signing the employment agreement

12     with Sterling?

13     A    Yes.

14     Q    And you admit signing an employment agreement with

15     Thompson Safety?

16     A    Yes.

17     Q    And your last day with Thompson Safety was March 28th,

18     2024?

19     A    Repeat that?

20     Q    Was the last day that you worked for Thompson Safety

21     March 28th, 2024?

22     A    No, sir.  It was March 27th.

23     Q    It's my understanding you gave notice on March 25th.

24     A    No, no, no.  I gave notice --

25                  MR. CRESCENZO:  Let him finish the question for you

1    before you answer.

2    BY MR. LOMBARDINO:

3    Q    On March -- to the best of your recollection your last

4    working with Thompson Safety was March 25th, 2024?

5    A    Correct.

6    Q    And you started your new company Jones Fire before you

7    resigned from Thompson Safety?

8    A    Correct.

9    Q    You started Jones Fire, three months before you resigned

10   from Thompson Safety, right?

11   A    Yes, sir.

12   Q    Why did you resign from Thompson Safety then?

13   A    Well, I still had bills to pay, I still needed a job.  It

14   was just a thought.

15   Q    So you wanted to keep receiving a pay check from Thompson

16   Safety while you set up in your competing business?

17   A    Yes.

18   Q    When you started Jones Fire, you knew it was going to be

19   a competitor of Thompson Safety?

20   A    Yes.

21   Q    And that was the point, right?  That was the point of

22   starting the business?

23   A    No.

24   Q    The point was not to be a competitor of Thompson Safety?

25   A    No.

1    Q    Do you consider Jones Fire to be a competitor of Thompson

2    Safety?

3    A    Yes.

4    Q    What is the name of the first customer you serviced for

5    Jones Fire -- and of course this is confidential with respect

6    to (indiscernible).

7    A    Homewood Suites.

8    Q    And was that before or after you resigned from Thompson

9    Safety?

10   A    Afterwards.

11   Q    Was Homewood Suites a customer that you serviced while at

12   Thompson Safety?

13   A    No.

14   Q    Okay.  Do you deny servicing Thompson Safety customers on

15   behalf of Jones Fire?

16   A    No.

17   Q    Do you deny servicing Sterling customers on behalf of

18   Jones Fire or the customers that were Sterling customers that

19   became Thompson Safety customers?

20   A    No.

21   Q    What is the name of the first Thompson Safety customer

22   that you serviced for Jones Fire?

23   A    I honestly couldn't recall.

24   Q    Did you start servicing customers for Thompson Safety --

25   withdraw the question.

1          Did you start servicing customers for Jones Fire before
2     you resigned from Thompson Safety?
3     A    No.
4     Q    How many Thompson Safety customers have you serviced on
5     behalf of Jones Fire?
6     A    Approximately less than five.
7     Q    And how many Sterling customers have you serviced on
8     behalf of Jones Fire?
9     A    About 100.
10    Q    And are any of those 105 customers, customers you
11    serviced while you were Thompson Safety?
12    A    No.
13    Q    Are any of those -- so none of the customers that you
14    serviced -- is it your testimony that you were not -- you've
15    not serviced any customer who was a customer of Thompson
16    Safety?
17    A    I'm sorry, repeat that.
18    Q    Is it your testimony that Jones, you or your company
19    Jones Fire, have not serviced any customers who were Thompson
20    Safety customers?
21    A    I have serviced customers that used to be Thompson Safety
22    customers.
23    Q    Is that 105 of them you said?
24    A    Just a rough estimate.
25    Q    Okay, so of those 105 customers, were those customers

1    that were Thompson Safety customers before you serviced them?

2    A    Less than five of them were Thompson customers.  The rest

3    have never been billed under Thompson.

4    Q    Okay, but they were Sterling customers?

5    A    Correct.  (Indiscernible).

6    Q    Okay.  So I'm not -- are any of the customers that you or

7    Jones Fire have serviced, were any of those customers that you

8    serviced were Sterling or for Thompson Safety?

9    A    I don't understand your question.

10   Q    You had a relationship with some of these customers that

11   you -- that you established or billed while at Sterling and/or

12   Thompson Safety, right?

13   A    Correct.  They were (indiscernible) for Sterling.

14   Q    Do you recall Mr. Roesler testifying about a conversation

15   a customer told him that you had about the lawsuit and about

16   technicians no having a licenses or interns, or something like

17   that?

18   A    I don't recall.

19   Q    Do you recall Mr. Roesler testimony about that?

20   A    Yes.  Yes.

21   Q    Do you deny telling a customer that Thompson Safety

22   employees are not licensed or didn't have insurance or

23   something like that?

24   A    I do not deny it.

25   Q    And you said that to try to get the business?

1    A    No.

2    Q    Because you didn't get the business, right?

3    A    I don't know who you're talking about, so I can't say yes

4    or no.

5    Q    Okay.  Do you deny soliciting or calling on customers at

6    Thompson Safety or Sterling after the Court entered the TRO?

7    A    Yes.

8    Q    So, okay, so you deny calling on Thompson Safety

9    customers after the TRO was entered?

10   A    Yes.

11   Q    And you deny calling on Sterling customers after the TRO

12   was entered?

13   A    No.

14   Q    You don't deny that?

15   A    I don't deny calling on Sterling customers, no.

16   Q    After the TRO was entered?

17   A    Correct.  I don't remember the exact date, but I believe

18   you're correct.

19   Q    And when you were at Thompson Safety, you had access to

20   route cards?

21   A    Yes.

22   Q    Those route cards had the schedule frequency for each

23   customer that needs to be serviced?

24   A    Yes.

25   Q    Did you make copies of those route cards before you

1   resigned from Thompson Safety?

2   A    Yes, I was in charge of printing them.

3   Q    So you knew what upcoming customers would need to be

4   serviced?

5   A    Correct.  But I've been doing it for years, so it's not

6   even necessary.

7   Q    So you had -- you had Thompson's pricing and you had the

8   route cards?

9   A    Thompson's pricing is completely independent of Jones

10  Fire's pricing.

11  Q    That's not my question.  My question or my question is --

12  okay, I'll ask a more precise question.

13       My question is you have Thompson Safety pricing, you have

14  Sterling pricing and you have the route cards, right?

15  A    Yes.

16  Q    And you're aware that the Court entered the Temporary

17  Restraining Order against you on July 24th, 2024?

18  A    Yes.

19       MR. LOMBARDINO:  And I'd like to have share my

20  screen.  Okay, there it is.

21       THE COURT:  We're turning it on now.

22  (Pause in the proceeding.)

23       MR. LOMBARDINO:  Thank you, Your Honor.

24  BY MR. LOMBARDINO:

25  Q    Okay, can you see the screen in front of me?

1  A    Yes.

2  Q    Have you seen this document or a copy of it before?

3  A    Yes.

4  Q    And for the Record what I've pulled up is the order TRO

5  granting -- the order granting application for a restraining

6  order.  I'm just referring to it as TRO for short.  And it's

7  Docket No. 13, Docket No. 13.

8      Okay, so I'm going to scroll down a little bit.

9      Looking at page 2 of the TRO there are certain

10 requirements that the Court ordered that you must comply with.

11 And I'm going to go through a few of them.

12     The first one is that Defendant -- which is both you and

13 your co-defendant -- are enjoined from breaching the

14 employment agreement.

15     Do you understand that was in the TRO order?

16 A    Yes.

17 Q    And did you take steps to comply with paragraph 1 on

18 page 2 of the TRO order?

19 A    It's hard to comply with a vague TRO.

20 Q    So the answer is no?

21 A    No.

22 Q    And then paragraph number 2 says that Defendants are

23 enjoined from continuing to employ Jones Fire.

24     Are you and Mr. Jackson still employed by Jones Fire?

25 A    Yes.

1  Q    And I'll skip three because you've already testified to

2  that.  And I'm skipping four because you've already testified

3  to that.

4       Step five.  In paragraph 7 it orders you and Mr. Jackson

5  to return all Thompson and that includes Sterling interation

6  and documents.

7       Did you comply with paragraph 7 on page 3 of the TRO

8  order?

9  A    Uh-huh.  Yes.

10  Q    What did you do to comply?

11  A    I don't have any Thompson property.

12  Q    How do you not have any Thompson documents?

13  A    A lot of Thompson -- I've had Thompson documents --

14            THE COURT:  One second counsel.  Can you-all speak

15  up?  The ERO can't hear you.  And maybe move the microphone

16  closer to you and speak a little bit clearer, everyone.

17            THE WITNESS:  Sure.  Okay.

18            Yes, I have Thompson documents.

19            MR. LOMBARDINO:  I just switched microphones.

20  Hopefully I come through clearer, Your Honor.

21            THE COURT:  Yeah, it's clearer.  Okay.

22  BY MR. LOMBARDINO:

23  Q    So what steps have you taken to return the Sterling

24  documents and the Thompson documents to Thompson?

25  A    None.

Q    Okay, paragraph 8 says Defendants must also turn over

their computers, cell phones, and accounts for forensic

analysis.  Have you or Mr. Jackson complied with paragraph 8

of the Court's TRO?

A    No.

Q    Okay.

          MR. LOMBARDINO:  Pass the witness.

          THE COURT:  You can do Direct at this time, counsel

for Defendants.

          MR. CRESCENZO:  Okay, thank you, Judge.

                    DIRECT/CROSS-EXAMINATION

BY MR. CRESCENZO:

Q    Mr. Jones, you indicated that you have Thompson documents

in your possession?

A    Yes.

Q    What Thompson documents do you have in your possession?

A    Probably a record of their employee handbook.  That's

about all that I know.

Q    To your knowledge that's the only document you have in

your possession?

A    Yes.

Q    Did you do work for Thompson Safety up until the point --

in the time frame between when you started, when you

incorporated Jones Fire and submitted your resignation to

Thompson?

1    A    Can you repeat the question?

2    Q    Sure.  Did you -- you indicated or did you continue to do

3    work on behalf of Thompson Safety in between the time that you

4    started Jones Fire and resigned from them?

5    A    I did not do any work for Jones Fire prior to my

6    resignation from Thompson.

7    Q    Did you do exclusively work for Thompson Safety up until

8    your resignation?

9    A    Correct.

10   Q    Did you do that work to the best of your ability?

11   A    Yes.

12   Q    Did you email a copy of the Thompson price list to

13   yourself?

14   A    Yes.

15   Q    Okay.  Let me finish my question it's going to be

16   confusing for everybody on the (indiscernible) to hear that.

17        So you did -- you emailed yourself the price list.  Why

18   did you email yourself the price list?

19   A    Because at the start of the new year they increased.

20   They had a price increase and I wasn't sure what I should

21   charge the customers.  And they are sometimes where I'm in a

22   remote area where I don't have access to pull up the documents

23   that they sent to me.

24        And they sent it to everybody.  So I printed it so that I

25   could have access to give the customers that information if

they requested it from me.

Q    Have you ever used any information on that price list in furtherance of your work for Jones Fire?

A    No.  That was independent from Jones Fire.

Q    To your knowledge what is the amount of gross revenue that Jones Fire has made up until this point?

A    Gross revenue, about 80,000.

Q    Do you know what your net revenue is?

A    Yes.

Q    If this injunction is entered, how is that going to affect you?

A    My life -- this is my livelihood now.  My business.

Q    Do you have a family?

A    I do.  I am expecting a baby in two months and lots of animals.

            MR. CRESCENZO:  No further questions, Your Honor.

            THE COURT:  Counsel, you may also Direct this witness.

            MR. WINKELMAN:  I don't have any questions.

            THE COURT:  Oh.  No questions or next -- I couldn't hear.

            MR. WINKELMAN:  I have no questions, Your Honor.

            THE COURT:  Anything further, Mr. Lombardino?

            MR. LOMBARDINO:  Just one or two questions, Your Honor, if I may?

REDIRECT EXAMINATION

BY MR. LOMBARDINO:

Q    So you mentioned earlier that you do have Thompson documents and that you do have Sterling documents, correct?

A    Correct.

Q    And we don't really know what you have or what you don't have since you did not comply with the Court's order to turn over your devices and accounts, right?

A    Correct.

Q    Do you agree that you're in the position to use the pricing list because you were in possession of it?

A    No.

Q    You don't agree that you were in a position to use it?

A    No.

Q    Did you delete it?

A    I've never -- yes, I have deleted it.  I don't have it anymore.

Q    When did you delete it?

A    Probably right when I left.

Q    Okay, so we can't confirm that because you haven't turned your device over for forensic analysis, right?

A    Yeah, because my property doesn't belong to (indiscernible).

Q    You believe the pricing list was your property?

A    No.

1          MR. LOMBARDINO:  No further questions, Your Honor.

2          THE COURT:  Anything further from Defendants?

3          MR. WINKELMAN:  I have no questions for this

4     witness, Your Honor.

5          MR. CRESCENZO:  Nothing for me either, Judge.

6          THE COURT:  Then this may witness may be excused.

7          (Witness steps down.)

8          THE COURT:  Before we get to the next witness, I

9     just want to know, am I going to hear any evidence from any

10    client -- any clients in this case that the Defendants

11    allegedly talked to or spoke with or, you know, gave any

12    information to from their former employer?

13         Have you decided -- I mean, it's not -- I'm not

14    asking for one, I just want to know am I going to hear that

15    any testimony from your side about that?

16         MR. WINKELMAN:  Not from us, Your Honor.

17         MR. LOMBARDINO:  I'm not understanding your

18    questions, Your Honor.

19         THE COURT:  Okay.  Well, what the issue is that the

20    Defendants are taking this information and then using it to

21    solicit clients or undercut your client in competing for the

22    business of those clients.  And I was just curious whether or

23    not I'm going to hear any information from the client's

24    perspective.

25         MR. LOMBARDINO:  So we are not prepared at this time

1    to call any clients especially in this hearing.  But we also

2    don't have the discovery that was ordered to be produced to

3    know whether certain communications were had or not had,

4    et cetera.

5            So it sort of deprived us to explore that issue.

6            THE COURT:  Okay.

7            MR. LOMBARDINO:  And that's one of the things that I

8    will talk about in argument.  But you wanted to jump into

9    evidence.  And so we just kind of skipped that part of it.

10           THE COURT:  Great.  Thank you.  That's what I needed

11   to hear.

12           Okay.  Ms. Gad or Mr. Lombardino, you may call your

13   next witness.

14           MR. LOMBARDINO:  Okay, so this just to speed things

15   up.  Counsel -- the only two questions I was going to ask

16   Mr. Jackson is that, you know, whether or not he admits

17   signing the employment agreement.  Because I don't want to

18   belabor, but I just -- all we went through.  But if you-all

19   could stipulate that he did sign them, then I'm just going to

20   not call him and you can tell him.

21           MR. CRESCENZO:  Yeah, we can stipulate.  I stipulate

22   that he signed the agreement.

23           MR. LOMBARDINO:  Okay, and I reserve the right to

24   Cross, but I'll just let you-all do it and if I don't feel

25   like it, it might save us some time.

1          MR. CRESCENZO:  That's good.

2          MR. WINKELMAN:  Thank you, Michael.

3          THE COURT:  Okay.  Great.  So, are there any other

4    witnesses?

5          MR. WINKELMAN:  So Your Honor, Lee Winkelman.  I'm

6    going to call Justin Jackson.

7          MR. LOMBARDINO:  So we'll -- I guess we'll,

8    quote/unquote, "rest" our case.

9          THE COURT:  You can call him in your case, but they

10   can direct him, so you're good.

11         MR. LOMBARDINO:  Yeah, yeah.  Okay.

12         THE COURT:  Mr. Jackson, if you could raise your

13   right hand?

14         (Witness sworn.)

15         THE COURT:  And before you start, counsel.  I just

16   need to take a three-minute break.  I want to grab a bottle of

17   water.  I've been talking all afternoon.  And then we'll be

18   right back, okay?  And maybe you guys can take a quick break

19   as well.

20         MR. LOMBARDINO:  Thank you, Your Honor.

21         THE COURT:  No problem.

22         (Recess taken from 5:35 p.m. to 5:45 p.m.)

23         THE COURT:  Okay, Counsel.  This is Judge Hanks.

24   I'm back again.

25         MR. LOMBARDINO:  Thank you, Your Honor.

1          THE COURT:  Okay, you may continue.  I know I just

2     swore in the witness, so you may proceed.

3                         DIRECT EXAMINATION

4     BY MR. WINKELMAN:

5     Q    Great, Mr. Jackson, can you please introduce yourself for

6     the Record?

7     A    Justin Jackson.

8     Q    You worked for Sterling actually two separate times,

9     didn't you?

10    A    Yes, sir.

11    Q    Okay, I want to talk about the first time you worked for

12    Sterling.  When you did you start working for Sterling

13    initially?

14    A    Approximately April of 2011.

15    Q    Okay.  And do you remember signing an employment

16    agreement with them when you started?

17    A    Yes, sir.  Back in April of '11.

18    Q    Were you aware at the time that you signed it that it

19    contained a provision that dealt with the use of certain

20    information?

21    A    No, sir.

22    Q    Okay.  So you're not aware that it had a confidentiality

23    agreement in it?

24    A    No, sir.

25    Q    Were you aware that it had a non-compete?

1    A    Yes, sir.

2    Q    And what was your understanding of the non-compete?

3    A    We couldn't work for a competitor that performed the same

4    services as Sterling.

5    Q    Okay.

6         THE COURT:  Okay, counsel.  I'm sorry.  We can't

7    hear.  You're going to have to move the microphone a little

8    bit closer or speak up.

9         MR. WINKELMAN:  Okay.  We're as close as we can get.

10   I huddle over here, so I'm going to try to be loud.

11        THE COURT:  Okay.

12   BY MR. WINKELMAN:

13   Q    Okay, so do you recall how long the non-compete was for?

14   A    Two years.

15   Q    Okay.  And what kind of work did you do for Sterling?

16   A    I initially started off doing first aid the first few

17   months -- four or five months.  And then I transferred over to

18   doing fire and safety.

19   Q    Okay.  You worked as a fire technician; is that correct?

20   A    Yes, sir.

21   Q    Okay.  And could you just briefly explain what servicing

22   fire extinguishers involves?

23   A    I would go into the customer.  I would check the

24   extinguisher, make sure there was no damage, make sure that

25   the gauge was still in the green.  I would check the date of

1    the extinguisher to see the age of it to see if there was any

2    additional service work that needed to be provided to it.

3    Q    Okay.  And were you -- was part of your job to maintain

4    the business relationship with the customer?

5    A    Yes, sir.

6    Q    Okay.  Now was part of your job there to offer other

7    products and services?

8    A    No, sir.  It pertained to fire extinguishers or the fire

9    part of the business.  No, sir.

10   Q    Okay.  And the first time that you worked there, were you

11   working full time or part time?

12   A    Full time.

13   Q    Okay, and when did you leave Sterling for the first time?

14   A    December 31st of 2014.

15   Q    Okay.  And so where did you go to work?

16   A    I went to work full time at a private immigration

17   facility.

18   Q    Okay.  So your non-compete then with Sterling would have

19   run in 2016; is that correct?

20   A    Yes.

21   Q    And did you come back to work for Sterling ultimately?

22   A    Yes.

23   Q    When was that?

24   A    The beginning of November 2016.

25   Q    And did you sign another agreement when you came back?

1   A    No.

2   Q    Okay.  When did you start working for Thompson?

3   A    September 5th, I believe it was, of 2023 when they

4   acquired Sterling.

5   Q    Was your work for Thompson different from what you were

6   doing at Sterling?

7   A    It was servicing fire extinguishers.

8   Q    Okay.  Was it different working for Thompson than it was

9   working for Sterling?

10  A    Yes, it was different.

11  Q    How so?

12  A    Sterling was more of a small mom and pop company where

13  you could build a relationships with the staff and build

14  relationships with the customers.  We had time to talk to the

15  customers to build that personal relationship with them versus

16  with Thompson they were more worried about just making the

17  money and they'd rush you from customer to the next and we

18  didn't have time to build any kind of relationship with any of

19  the Thompson customers.

20  Q    Got you.  Okay.

21       Did Thompson's prices increase whenever they took over?

22  I'm sorry, scratch that, strike that.

23       When Thompson took over for Sterling, were their prices

24  higher than Sterlings?

25  A    Yes.

1    Q    Okay.  Do you remember signing an employment agreement
2    with Thompson?
3    A    Yes.
4    Q    When did you sign that?
5    A    September 5th, the day that they acquired -- that we were
6    told that they acquired Sterling.  We were told that we had to
7    sign it if we wanted to stay employed.
8    Q    Okay, so it was given to you on a take it or leave it
9    basis?
10   A    Yes.
11   Q    And how was it given to you?
12   A    On a tablet for us to sign.
13   Q    Okay.  Did they give you time to read it before you
14   signed it?
15   A    Not really.
16   Q    Did you ever get a copy of it?
17   A    Not that I recall.  I never got a paper copy of anything.
18   And I don't recall getting an email.
19   Q    At the time that you signed it, were you aware that it
20   contained a confidentiality provision that you required you to
21   keep certain information secret?
22   A    No.
23   Q    How about a non-compete?
24   A    Yes.
25   Q    Now did anyone at Thompson go through the agreement with

1      you to explain it to you?

2      A    No, not of the confidential.  None of that was explained.

3      Q    None of the terms of the agreement were?

4      A    No, sir.

5      Q    Okay.  And when you worked for Thompson was that on a

6      full time basis or a part time basis?

7      A    Part time.

8      Q    Okay.  So you were working part time for Thompson.  And

9      about how many hours were you working?

10     A    It varied.  Some weeks it would liable to be 20 hours.

11     Other weeks liable to be 30.

12     Q    And how much were you making?

13     A    Seventeen an hour.

14     Q    So on a monthly basis, about how much is that?

15     A    Any where from 15 to 2,000 a month.

16     Q    1500?

17     A    1500 to 2000 a month.

18     Q    Okay, can you talk about what you did for Thompson?

19     A    I would go and inspect the extinguishers, check the

20     dates, make sure there was no damage to the extinguishers.  If

21     there was any work that needed to be performed other than

22     inspections, then we would swap them out.

23     Q    All right.  And still responsible for servicing the

24     customers?

25     A    Yes, sir.

Q    I believe you testified earlier though that there wasn't
must establishment of customer relationships, correct?

A    No, sir.  I didn't establish any relationships really
with any of the Thompson customers because we were always
being rushed to go to the next one.  They were more worried
about bringing money in than actually building a relationship.

Q    And what areas -- what geographic areas did you work in
for Thompson?

A    North Houston, Conroe, Woodlands.  The same place that we
covered for Sterling.  Any of the Thompson customers I did
most of those were either close to their office on Wakehaven
(phonetic) or further south.

Q    Okay.  So really in the North Houston area?

A    North Houston was all Sterling customers.  There was only
a few Thompson that I took care of.

Q    Okay.  Did you work anywhere else?  Any other areas?

A    I'd been sent out to Orange to do a customer that nobody
else wanted to do.

Q    Okay.  Did you ever went as far as Dallas or anything,
did you?

A    No.

Q    Were you responsible for offering other products and
services that Thompson provided to these customers other than
fire extinguishers?

A    Just fire.

1    Q    Were you responsible for bringing in any business?

2    A    No, they wouldn't allow us to bring in new business.

3    That was a different department.

4    Q    Now when Thompson bought Sterling and they took over, did

5    customers leave Thompson initially?

6    A    Yes, there were several Sterling customers that left.

7    Q    Okay.  And what was your understanding as to why they

8    left?

9    A    The pricing was significantly higher, so they didn't want

10   to pay the higher prices.  And they also wanted to deal with a

11   smaller mom and pop, so they could have that personal

12   relationship versus just being a number or just being a client

13   of a larger company.  They preferred the personal

14   relationship.

15   Q    Okay.  Now while at Thompson, did you have a company

16   phone there?

17   A    No.

18   Q    Okay.  What phone did you use?

19   A    My personal.

20   Q    So the Thompson clients have your personal cell phone

21   number?

22   A    Yes.

23   Q    Okay.  If they were to call you then now wanting to --

24   wanting to talk to somebody at Thompson, it would go to your

25   personal cell phone?

1   A   Yes.

2   Q   Have you had any clients call since you left?

3   A   Yes.

4   Q   What did you tell them?

5   A   I told them they needed to contact the Thompson office.

6   Q   Okay.  Who are you currently employed by?

7   A   Jones Fire Protection.

8   Q   When did you begin working there?

9   A   April of '24.

10  Q   Are you working there full or part time?

11  A   Part time.

12  Q   About how much are you making?

13  A   500 a week.

14  Q   And why did you go -- why did you leave Thompson to go

15  work for Jones Fire?

16  A   I left from Thompson due to the fact that they had

17  service technicians that had a fire license that were passing

18  their license off to non-licensed employees for them to go do

19  inspections.  And I didn't want to get caught up in any of the

20  legal ramifications of that.  And I had had a take home

21  vehicle to begin with.

22      And when the new GM took over, I had that vehicle pulled

23  where I was no longer allowed to take it home.  So it was no

24  longer financially viable for me to make the drive down there

25  in my personal vehicle versus using a company vehicle.

1    Q    Okay, so you were concerned about your own, I guess,
2    liability for criminal violations that were being committed?
3    A    Yes, sir.  I didn't want to get drawn up in an
4    investigation or have to deal with any of that due to other
5    Thompson employees doing illegal activities.
6    Q    Did you actually ultimate make a complaint to the Fire
7    Marshal about that?
8    A    Yes.
9    Q    Do you know what happened with that?
10   A    I do not.  I haven't heard back.
11   Q    When you were at Sterling or Thompson, the supplies
12   either place, did you ever receive any sort of specialized
13   training?
14   A    No.
15   Q    Okay.  At Sterling or Thompson did you ever receive any
16   training on what was considered to be secret or confidential
17   information?
18   A    No.
19   Q    At Sterling or Thompson, did you ever receive any
20   training on what company information should be shared and what
21   company information should not be shared?
22   A    No.
23   Q    Did anyone at Sterling or Thompson ever discuss
24   confidential information with you and the need to keep it
25   secret?

1    A    No.

2    Q    Did you receive any training at Sterling or Thompson of

3    what was considered a trade secret?

4    A    No.

5    Q    Did anyone at Sterling or Thompson ever discuss trade

6    secrets with you and the need to keep it secret?

7    A    No.

8    Q    Okay.  Did you ever receive, while at Sterling or

9    Thompson, any document ever marked as confidential?

10   A    No.

11   Q    Did you ever receive anything that you were told to keep

12   confidential?

13   A    No.

14   Q    Did you ever receive anything that you were told was a

15   trade secret?

16   A    No.

17   Q    Okay.  Are you aware of any policy that Sterling or

18   Thompson that would indicate what information -- company

19   information should or should not be shared?

20   A    No.

21   Q    While at Sterling or Thompson, did you ever receive

22   compilations of market information?

23   A    No.

24   Q    Did you ever receive a customer list?

25   A    No.

Q    At Sterling or Thompson, did you ever receive any business plans?

A    No.

Q    At Sterling or Thompson, did you ever receive any internal financial statements?

A    No.

Q    At Sterling or Thompson, did you ever receive any internal financial analysis?

A    No.

Q    At Sterling or Thompson, did you ever receive any personal files or evaluations?

A    No.

Q    While you were at Sterling or Thompson, did you ever receive any internal cost information?

A    No.

Q    Let me ask you a question.  Can you determine Thompson's customers from publicly available information?

A    Yes.

Q    And how would you go about doing that?

A    I can go on their website and under the customer reviews they've seen in order to know which customers they take care of.  Or I can simply get information by walking in any business that has fire extinguishers and looking at the tag to know if Thompson services them or if another company does.

        And to also find out when they're due.

1    Q    Okay.  Right, which would you give some clue as to what

2    the -- that customer's needs are, correct?

3    A    Correct.

4    Q    So you're able to find customer information and customer

5    needs publicly?

6    A    Yes.

7    Q    And how about pricing?  Could you get the pricing

8    information publicly?

9    A    Yes.

10   Q    And how would you go about doing that?

11   A    The customer would give it to me.

12   Q    Let me ask you another question.  Final -- coming up here

13   on the end.  Would you suffer any economic hardship if you

14   were unable to work for Jones Fire?

15   A    Yes.

16   Q    Okay, how so?

17   A    I rely on the income from there to help pay my bills.

18   Q    So you would be unable to support your family?

19   A    Correct.  Yes.

20   Q    Okay.

21            MR. WINKELMAN:  No further questions.

22            I pass the witness.

23                         CROSS-EXAMINATION

24   BY MR. LOMBARDINO:

25   Q    So you were kind of asking questions about how you

1    could -- how you could find a Sterling or Thompson customer,

2    Sterling customer.  And you talked about you could go just go

3    into and look at the tag.

4         Do you remember him asking you about that?

5    A    Yes.

6    Q    But that's not what you-all did, right?  You-all didn't

7    do that?

8    A    I have knowledge of the customers for the simple that

9    I've done this for over a decade.

10   Q    Right, exactly.  And your employment agreement, it does

11   contain a provision about confidentiality, right?  You don't

12   deny that?

13   A    I don't know if it's in there or not.

14   Q    When you were given the employment agreement to sign, did

15   you ask for an opportunity to read it?

16   A    They were rushing us through it to sign it or not be

17   employed.

18   Q    When you were given the employment agreement to sign, did

19   you ask for an opportunity to read it?

20   A    We were rushed through it so I didn't get an opportunity

21   to read it because they were rushing us to sign a bunch of

22   different documents at the time that we were acquired.

23   They --

24   Q    Did you ask for an opportunity to read it?

25   A    Again, I would like to read it, but they were still

1    rushing us to sign it.

2    Q    Did you ask for a copy of it?

3    A    They said they was supposed to give us a copy and I never

4    received -- I know I didn't receive a hard copy and I don't

5    recall getting an email copy either.

6    Q    Did you ask for a copy of it?

7    A    No, because they said they were going to send it to us.

8    I don't need to ask if they're offering to send it to me.

9         (Pause in the proceeding.)

10   Q    Sterling customers are Thompson customers, right?

11   A    Sterling customers are Thompson customers?

12   Q    Well, when Thompson bought Sterling, didn't Sterling

13   customers become Thompson customers; as far as you know?

14   A    No.  They never did business with Thompson and it

15   wouldn't be a Thompson customer.

16   Q    But Thompson purchased Sterling's customer relationships

17   as part of the transaction when Thompson bought Sterling.  Did

18   you understand that?

19   A    They may have bought the business relationship, but they

20   didn't buy my personal relationship at all.

21   Q    And would you agree with me that that's the point of a

22   non-solicit is to help protect the personal relationships that

23   you built on behalf of Sterling, on behalf of Thompson?

24   A    If the customer denied and didn't want to be serviced

25   with Thompson, then I wouldn't be taking anything away from

1    Thompson once I leave Thompson.

2    Q    But on the other hand, there's other companies that the

3    customer can go to for services besides Jones Fire, right?

4    A    Right.

5    Q    So if they're unhappy with Thompson or Sterling, there's

6    plenty of other companies that they can go to?

7    A    Correct.

8    Q    And what customer reviews were you talking about online?

9    A    If you go to the Thompson website, they encourage the

10   customer to leave reviews about Thompson.  That tells me who

11   the customer is and who they service, doesn't it?

12   Q    So does -- is it your testimony that all of Thompson's

13   customers and all of Sterling's customers are on the website?

14   A    I did not say all of them.  I said some.

15   Q    And is the review the person's name or is it their name,

16   their contact information, who is in charge of making

17   decisions about your current fire equipment, et cetera?

18   A    It's the company name and some of them have the name of

19   the person that left it.  So if they're the ones that left it,

20   common sense would tell you most likely they are either in

21   purchasing or the person that makes that decision.

22   Q    Okay.  And are you aware that compilations of publicly

23   available information can be a trade secret?

24            MR. WINKELMAN:  Objection, that calls for a legal

25   conclusion.

1           THE COURT:  The objection was -- I'm sorry I

2   couldn't hear it.

3           MR. WINKELMAN:  It calls for a legal conclusion.

4           THE COURT:  Objection overruled.

5           The witness can answer with respect to his own

6   understanding.  Any legal testimony he provides, the Court

7   won't accept.

8           Okay, you may proceed.

9   BY MR. LOMBARDINO:

10  Q    Are you aware that compilations of publicly available

11  information can be considered trade secrets?

12  A    No.

13  Q    I'm sorry?

14  A    No.

15  Q    And the Sterling customers since -- I've noticed you and

16  Mr. Jones are distinguishing between Sterling customers and

17  Thompson customers.  So I'm asking about Sterling customers.

18          My question will start now.  Sterling customers that you

19  claim left, were those after Thompson took over but before

20  Jones left, Jones Fire was started.  Were those customers that

21  you were referring to your customers?

22  A    What do you mean by "my" customers?

23  Q    Well, okay.  The customer relationship -- the customer

24  relationships that you managed --

25  A    Okay.

Q     -- filling in for Thompson and I know that most of them
were, historically speaking, for Sterling, right?

A     Okay.

Q     So when your attorney was asking you questions, one of
the things that you said was that there were Sterling
customers that left once Thompson took over.

       Do you understand saying that?

A     Yes.

Q     Okay, those Sterling customers that left, were those
customers that you were managing?

A     Customers that I took care of?  Yes.

Q     Okay.  Of the -- to the best of your knowledge of the 105
or so customers that -- strike that.

       To the best of your knowledge how many customers does
Jones Fire have that are not former Thompson customers or
former Sterling Customers?

A     I would not know that.

Q     Can you give me the name of one customer that you know --
that you would know of that is not a former Sterling or former
Thompson customer?

A     I couldn't do that because I don't know all the customers
that Jones takes care of.

Q     Right.  So I'm talking of the customers that you take of.
Are any of the customers that you take care of -- were any of
them -- and I'm talking about while -- now that you're at

1    Jones Fire.

2    A    Uh-huh.

3    Q    Any of the customers that you take care of, are there any

4    of that were not former Thompson customers or former Sterling

5    customers?

6    A    Not that I can think of off the top of my head.

7    Q    And do you remember the questioning that I was asking

8    Mr. Jones about the TRO order and whether taking any steps to

9    comply with the TRO order?

10   A    Yes.

11   Q    Have you taken any steps to comply with the TRO?

12   A    No.

13            MR. LOMBARDINO:  Pass the witness.

14            MR. CRESCENZO:  I have no questions, Your Honor.

15            THE COURT:  I'm sorry?

16            MR. CRESCENZO:  I said I have no questions.

17            THE COURT:  You have no questions?  I couldn't hear.

18   I'm sorry.

19            MR. WINKELMAN:  Right, Your Honor.  He said he has

20   no questions.  I think we can be done with this witness.

21            THE COURT:  Okay.  I couldn't hear.  I'm sorry.

22            MR. WINKELMAN:  I believe we're done with the

23   witness, Your Honor.

24            THE COURT:  Okay.  Great.  This witness may be

25   excused then.  Thank you, sir.

1                (Witness steps down.)

2                THE COURT:  The next witness?  Mr. Lombardino or

3    Ms. Gad?

4                MR. LOMBARDINO:  We have no further witnesses to

5    call.  We assumed that was going to be that trial hearing and

6    just load up and just have tons of witnesses, so.  That's all

7    who we are prepared to call at this time.

8                THE COURT:  Great.

9                And Defendants?  Any other witnesses that you wish

10   to call?

11               MR. WINKELMAN:  No, Your Honor.

12               THE COURT:  Okay, then.  Well, thank you-all then

13   for your time and patience.  What I'd like for you to do is

14   submit to me just a brief two-page summary argument based on

15   the evidence that you heard -- that the Court heard that the

16   parties presented.  And how that evidence supports the

17   arguments that you made in your briefing before the temporary

18   injunction and then in opposition to the temporary injunction.

19               And if you can get that on file by next Tuesday,

20   then I will get an answer back to you by the end of next week.

21               MR. WINKELMAN:  Thank you, Your Honor.

22               MR. LOMBARDINO:  Thank you, Your Honor.

23               The one point that I'd like to make is that the TRO

24   that you implemented expired yesterday.  So there currently is

25   no order in place restricting anything and then we also still

1   have to deal with the issue of the devices not -- never being

2   turned over.  Is that -- I know we're here late and everyone

3   needs to get going, but you know, is that something that we

4   can talk about right now or?

5           THE COURT:  Sure, we can talk about it.  I guess the

6   first thing is, I think the parties need to sit down and

7   figure out, you know, how to maintain the status quo until the

8   Court gets a ruling.  I can't get a ruling right now for you.

9           I like to hear -- I like to see, you know, what you

10  believe the evidence showed.  But I want it in writing.  I

11  don't want to do this by oral argument.

12          So, I think the parties need to get together and

13  maintain the status quo.  So basically the changing at this

14  point doesn't help anyone.  I think that the parties need to

15  maintain the status quo until I can get your briefing and then

16  I'll get an answer back as quickly as I can.

17          If either side -- I don't know if one side is, you

18  know, using trade secret information.  I don't know if it is

19  or it's not happening.  It's not clear to me yet.  I want to

20  hear your arguments.

21          But I think that the parties should have some middle

22  ground as to what should or should not be done.  I mean, the

23  TRO is expired.  I had conditions on the TRO.  You know, those

24  weren't complied with, but then Defendant's argument is, is

25  that they weren't there for the hearing.  Didn't know about

them.  Didn't understand everything.  Thought they were vague.

I can deal with that a little later from arguments from the side.  But basically I need you guys to get together to maintain the status quo until I can get a ruling out.

If you can't do that, let me know and I'll still get the ruling out as quickly as I can.

MR. LOMBARDINO:  Well, --

THE COURT:  I think that's the first step.

MR. LOMBARDINO:  With respect, there is no -- they never complied with the status quo is that they're going to keep doing everything that they've been doing.  That's okay.

THE COURT:  Well, have you -- no, no.  Have you sat down and talked to them about what they're doing and whether or not there's some middle ground that you guys can reach?

MR. LOMBARDINO:  We --

THE COURT:  I don't know.  Have you done that?

MR. LOMBARDINO:  We will make a concerted effort to do that.  We did propose some potential resolutions back and forth.  And, you know, if we need to try to do that.  But I think the parties kind of had our vastly different on -- have that vastly different perspectives on what's going on.

THE COURT:  Okay.  Well, I can't get a ruling out to you any quicker than next week.  So, you know, the bottom line is I think it's in everyone's best interest to try to agree -- reach some sort of temporary agreement until I can get a

1    ruling out.

2         Not reaching an agreement doesn't really help

3    anyone.  So I think you probably need to sit down and talk

4    about it.  But regardless whether you enter an agreement or

5    not, I can't get you an answer back tonight.  And I can't get

6    you an answer back tomorrow.

7         The earliest I'll get an answer back to you is on

8    Tuesday.  And that's realistic.  So, I would encourage you to

9    get together and talk to each other and have a conversation

10   about how to maintain the status quo.

11        Maybe if you start talking you might agree.  I mean,

12   the Defendants believe they're not doing anything wrong.  You

13   believe they're doing things wrong.  Maybe you can come up

14   with some areas of agreement as to what both sides agree that

15   should not be done.

16        Like taking customer lists and using that pricing

17   information.  Probably not -- shouldn't be done.  I don't know

18   if it is or not, but probably shouldn't be.  So I think

19   there's some area where the parties could probably reach an

20   agreement.

21        And if you can't, you can't.  That's great.  And

22   then you know, I'll rule and move on.

23        MR. WINKELMAN:  Mike, I think we can -- I think

24   there's more common ground than you think.

25        MR. LOMBARDINO:  Okay.

1          THE COURT:  I bet you there is.

2          MR. WINKELMAN:  Yeah, we'll continue those

3    conversations.

4          THE COURT:  I think that's where you need to start.

5    Usually what happens in these cases -- and you guys are good

6    lawyers.  You know you've done it a thousand times like me.

7    You need to get the parties together and start with, okay,

8    what is it that we all agree that should not be done, you

9    know, under the terms of the non-compete agreement or the

10   covenants.

11         That's where the parties typically start.  You know,

12   what do we all agree we should not be doing or no one should

13   be doing.  Pretty much that -- there is some common ground

14   there because, you know, very rarely does one side say you

15   know what?  I want the entire covenants opt out.  It's not

16   going to be applicable.

17         I'm willing to die on this sword and say that I'm

18   never going to comply with any -- I'm going to use information

19   as I want.  I'm going to see as many clients as I want and do

20   whatever I want because the covenants just not -- is void.

21         Happens every now and then, but very rarely.

22   Usually everybody agrees that there's certain things that the

23   parties should not be doing.  And you start from there.

24         And then from there -- that's typically in all these

25   cases.  And then from there see how far you can get.  But

1     bottom line is I'm not going to be able to rule until next

2     Tuesday. So between now and then, it's good for you to talk,

3     one. And then two, get me no more than a three-page brief

4     summarizing what you believe the evidence to show this

5     afternoon and how that evidence supports the claims that

6     you've made.

7            MR. WINKELMAN: Your Honor, just to clarify that

8     could be filed anytime on Tuesday?

9            THE COURT: It needs to be filed by Monday.

10           MR. WINKELMAN: Monday, okay.

11           THE COURT: Yes, Monday. Because Tuesday I'm going

12     to try to -- if you guys haven't reached any agreement, then

13     I'm going to rule as quick as I can on Tuesday. If you reach

14     an agreement, it'll probably be Tuesday evening -- I mean,

15     Tuesday morning.

16           But if you haven't reached an agreement -- well, if

17     you have reached an agreement the answer will probably be

18     Tuesday evening. If you haven't reached an agreement then I'm

19     going to get to it first thing on Tuesday.

20           Well, not first thing. I will get it out first

21     thing on Tuesday.

22           MR. CRESCENZO: Great, thank you, Your Honor.

23           MR. WINKELMAN: Thank you, Your Honor.

24           THE COURT: Okay. No problem. Thank you-all for

25     your patience. I know its been a long afternoon. But it been

1  even longer for the lawyers that are coming up next.  So you

2  guys have a great evening and we'll talk again on Tuesday.

3         And if you have any -- and if there's anything you

4  think that I can help you with, please let me know.

5         MR. WINKELMAN:  Thank you, Your Honor.

6         MR. CRESCENZO:  Thank you, Your Honor.

7         THE COURT:  Take care everyone.  You may be excused.

8  Good night.

9         (Proceeding adjourned at 6:14 p.m.)

10                        * * * * *

11        *I certify that the foregoing is a correct transcript*

12  *to the best of my ability produced from the electronic sound*

13  *recording of the Zoom proceedings in the above-entitled*

14  *matter.*

15      /S./  MARY D. HENRY

16  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

17  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

18  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

19  *JTT TRANSCRIPT #69001*

20  *DATE FILED:  AUGUST 11, 2024*

21

22

23

24

25